[Cite as *State v. Robinson*, 2013-Ohio-4375.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No.  99290

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# ROBERT ROBINSON

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-560218

**BEFORE:** Boyle, P.J., Blackmon, J., and McCormack, J.

**RELEASED AND JOURNALIZED:** October 3, 2013

**ATTORNEYS FOR APPELLANT**

Robert L. Tobik
Cuyahoga County Public Defender
Cullen Sweeney
Assistant Public Defender
310 Lakeside Avenue
Suite 200
Cleveland, Ohio   44113

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
Brent C. Kirvel
Assistant County Prosecutor
9th Floor, Justice Center
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, P.J.:

**{¶1}** Defendant-appellant, Robert Robinson, appeals his conviction and sentence. Finding some merit to the appeal, we affirm the convictions but vacate Robinson's sentence and remand for a new sentencing hearing.

Procedural History and Facts

**{¶2}** Robinson and codefendant Jeremy Logan were charged in a ten-count indictment: aggravated murder and two counts of murder involving one victim (Counts 1-3), six counts of felonious assault involving six different named victims (Counts 4-9), and discharging a firearm on or near prohibited premises (Count 10). All counts included one-, three-, and five-year firearm specifications.

**{¶3}** Robinson pleaded not guilty to the charges, and the state voluntarily dismissed the aggravated murder charge prior to trial. The matter proceeded to a jury trial. The charges arose out of the fatal shooting of Dena'Jua Delaney ("Bubbles") on February 22, 2012, around 3:15 in the afternoon. The incident took place on Garfield Road (a.k.a. "The One Way"), a one-way residential street in East Cleveland, stemming from two competing groups of people squaring off to fight.

**{¶4}** At trial, the state presented 25 witnesses, including 17 eyewitnesses, each who offered slightly varied accounts of the events in question. We summarize the following pertinent facts from the evidence presented at trial.

**{¶5}** The night before the fatal shooting, on February 21, 2012, Russell Stokes and Latima Brown got into a heated altercation after a night of hanging out and drinking at

Latima and Bubbles's East Cleveland apartment. Russell ultimately left the apartment after threatening Latima. At the time, Russell was "staying" nearby at his aunt's house on The One Way.

{¶6} The next day, Russell called his best friend, S.P.,[1] who was Robinson's girlfriend at the time, and told her to "beat up" Latima. Consequently, S.P., along with her sister and two friends, D.B. and B.D., went over to The One Way to fight Latima.

{¶7} According to Latima, she received a call the next day from Russell, telling her to go outside, where she encountered three females coming down The One Way to meet her. Although witnesses offered various accounts of the fight that ensued, Latima returned to her apartment after the fight with apparent injuries, including a "bloody face," and was upset. This prompted Bubbles to call many of her family and friends, asking them to meet on The One Way "to fight."

{¶8} According to Latima, approximately 15 people — nine females and six males — congregated outside of her and Bubbles's apartment building in response to Bubbles's calls. Other witnesses estimated approximately 20 to 30 people gathered. The group ranged in ages from late teens to early 20s.

{¶9} Amongst the calls Bubbles made, Russell received one. He testified that Bubbles stated "you all jump my best friend" and now "you just signed your death certificate."

---

[1] S.P., age 16 at the time of trial, testified that she has known Robinson, age 19, since she was 13 years old. We further note that the names of all of the juvenile witnesses who testified at trial are abbreviated in this opinion.

{¶10} Russell, in turn, called S.P. According to S.P., she got a call, "saying that they was trying to jump Russell, they outside trying to jump Russell and stuff. And then I called — my boyfriend" — Robinson. S.P. told Robinson, "come get me, they're about to jump my best friend Russell." Robinson, who drove a two-door gold Saturn, picked up codefendant, Jeremy Logan, S.P., and her two friends, D.B. and B.D., and drove to The One Way. According to Logan, Robinson called and asked him to accompany him to The One Way "because he didn't want to be up there by himself in a fight."

{¶11} When Robinson arrived on The One Way, a mob quickly convened near Robinson's car, which had stopped near Russell's aunt's house. According to Russell, he ran back inside his aunt's house once he realized that they were "outnumbered." According to S.P., she jumped out of the car, and a heated altercation ensued. D.B. and B.D. never left the car. Ultimately, when all five occupants were seated in the car, Devere Ealom, a friend of Bubbles, ran up to the front seat passenger side of the vehicle and punched Logan in the face. The eyewitnesses' accounts of what happened next, including the fatal shooting of Bubbles, conflict.

{¶12} According to the majority of the eyewitnesses present, after Logan was punched, the car moved slightly forward, allowing Logan to position himself on the door jamb and hang his upper body outside the car while he fired several shots above the car toward the crowd of people behind the car on Garfield Road. The witnesses characterized this as the first round of shots. Following Logan's firing of his gun, Robinson fired his gun out his window and toward "the back of the car." This was characterized as the

second round of shots.   Several witnesses testified that Bubbles was standing after the first round of shooting but not after the driver (Robinson) shot his gun.   After Bubbles fell to the ground, Robinson drove off.

{¶13} According to Bubbles's friends and family, no one from the crowd ever fired any shots at the car until after Bubbles had already fallen down.   Instead, these witnesses testified that someone from the crowd fired what sounded like a shotgun following the screaming that Bubbles was down.   Even Russell Stokes — Robinson's girlfriend's best friend — testified that first there were shots fired from the car, a couple of people hit the ground, the car took off, and then someone from the crowd "got to busting [shooting]" toward the car while the car was moving away.   The same shooter then apparently spotted Russell in the window, "[h]e shoot toward the house, shot in the corner of the window, the room that we was in."

{¶14} Conversely, Robinson (through his statement to the police) and Logan (through his testimony at trial) stated that someone from the crowd was shooting at their car.   According to B.D. and D.B., also passengers in Robinson's car, there were gunshots at the car.   D.B. testified, however, that the first shots came from the "boys in the front seat" — Robinson and Logan. S.P. never mentioned any shooting directed at the car. According to her, Logan fired at least four or five shots toward the crowd of people.   She further testified that after they pulled away from The One Way, Logan said, "Ah, I shot someone.   I'm going to break my phone.   What am I going to do?"

{¶15} East Cleveland police responded to the call of gunshots and victim down. East Cleveland police detective Reginald Holcomb testified that, through initial interviews at the scene, the police quickly learned that Jeremy Logan was a passenger in the car and had fired his gun into the crowd. They further recovered Logan's gun, a Rossie .38 Special revolver, based on an anonymous tip called into the station, which Logan acknowledged as being his gun after being called in by the police. Robinson, likewise, turned himself into the police and ultimately admitted to firing a single shot "out the window towards the back of [his] car." According to Robinson's statement, someone from the crowd fired a single round first, then Logan fired his gun, and then someone from the crowd fired another one or two shots. At that point, Logan told Robinson that "his gun was messing up" so Robinson fired a single shot and then they drove away. Based on Robinson's admission, the police also recovered Robinson's gun, a .38 caliber Smith & Wesson revolver.

{¶16} Immediately following the shooting, the police recovered a bullet from the windowsill of the upstairs residence at 1826 Garfield Road. They also recovered a bullet fragment from a .32 caliber discovered in the front yard of 1824 Garfield Road. The fragment and bullet were later determined to both be .32 calibers. According to Andrew Chappell, a forensic scientist qualified "in the area of firearms comparison and ballistics comparison," the fragment and bullet recovered from the residence could not have been shot out of either one of the firearms recovered from Robinson and Logan because their revolvers were .38 caliber.

{¶17} The police, however, recovered a .38 Special/.357 Magnum caliber bullet found near the victim. According to Chappell, he "was able to eliminate the Rossie revolver as being the gun that fired the bullet based on a difference in class characteristics." With respect to Robinson's gun, the Smith & Wesson pistol, "it was found to have the same class characteristics; however, the first bullet didn't have sufficient individual characteristics" to conclusively say that it was fired from Robinson's gun. Chappell explained that the lack of "sufficient individual characteristics" could be attributed to a variety of causes, including the bullet passing through bone.

{¶18} The state additionally offered the testimony of deputy medical examiner Dr. Andrea McCollom, who testified that the victim died from a gunshot wound of the face with skull and brain injuries. According to Dr. McCollom, the victim's entrance wound was "lateral to the right eye" and there was a "two and a half by three and a half inch area of stippling of the right face, including the upper eyelid." She further identified an exit wound of the bullet out of the victim's scalp. Dr. McCollom testified that the victim suffered a deadly injury that ordinarily would cause a person to lose consciousness immediately. On cross-examination, Dr. McCollom explained that the injury inflicted to the victim would cause someone to fall. She further indicated that the angle of the bullet was "slightly downward" and that the existence of stippling was indicative of an "intermediate range gunshot wound." Specifically, she explained that the range "is up to about three feet."

{¶19} After the presentation of the state's case, Robinson moved for an acquittal of all the charges under Crim.R. 29. The trial court granted it with respect to one of the felonious assault counts (Count 9).

{¶20} As part of the jury instructions, the trial court instructed the jury on aiding and abetting with respect to the state's alternative theory that Robinson aided and abetted Logan in the commission of the crimes.

{¶21} The jury ultimately acquitted Robinson of the murder count contained in Count 3, a violation of R.C. 2903.02(A), but found him guilty of felony murder, a violation of R.C. 2903.02(B), as contained in Count 2. The jury further found Robinson guilty of five counts of felonious assault, violations of R.C. 2903.11(A)(2) (Counts 4-8), and one count of discharging a firearm on or near prohibited premises, a violation of R.C. 2923.162(A)(3) (Count 10). The jury found Robinson guilty of the one- and three-year firearm specifications related to these counts, but not guilty of the five-year firearm specifications attendant to those counts.

{¶22} The trial court ultimately imposed a sentence of life imprisonment with the possibility of parole after 21 years: 15 to life for felony murder (Count 2), two years on each of the felonious assault convictions (Counts 4-9), three years for discharging the firearm on or near a prohibited place (Count 10), and a single three-year firearm specification, with the base offenses running concurrently except for the three-year sentence on Count 10.

**{¶23}** Robinson now appeals, raising 15 assignments of error. These assignments of error are set forth in the attached appendix.

<u>Sufficiency of the Evidence</u>

**{¶24}** In his first three assignments of error, Robinson argues that the state's evidence against him was insufficient to sustain the convictions.

**{¶25}** When an appellate court reviews a record upon a sufficiency challenge, "'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶26}** Robinson was convicted of one count of felony murder, five counts of felonious assault, and one count of first-degree felony of discharging a firearm on or near prohibited premises. We will address each offense in turn.

*Felony Murder*

**{¶27}** To survive a Crim.R. 29 motion for acquittal, the state had to present sufficient evidence on the elements of felony murder, such that the trier of fact could find Robinson guilty of the offense beyond a reasonable doubt. The elements are defined as follows:

{¶28} Under R.C. 2903.02(B), felony murder, "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree."

{¶29} The underlying felony giving rise to the felony murder was felonious assault against Bubbles. Thus, to support the count of felony murder, the state had to present sufficient evidence that Robinson caused the death of Bubbles as a proximate result of his felonious assault against her.

{¶30} Under R.C. 2903.11(A)(2), felonious assault, "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

{¶31} Robinson argues that the state's evidence is deficient in two respects: (1) that it failed to present legally sufficient evidence that he shot Bubbles and caused her physical harm, and (2) that it failed to prove that he acted "knowingly." We find no merit to Robinson's sufficiency challenge. Indeed, Robinson acknowledges that several eyewitnesses testified that they saw Bubbles "go down" after Robinson fired his gun. And these witnesses testified that there was no shooting from the crowd directed toward the car or anywhere else until after Bubbles went down.

{¶32} For example, Paul Small, who lives on Garfield Road — and was not a party to either group that congregated on Garfield Road for the fight — testified that he watched from his window and observed "the car speeded off, dude [front seat passenger] got up out of the car and shot twice." Small explained that the car "was rolling slow * * *; [s]low

enough for him to shoot.   He shot twice and the gun got jammed."   Small further testified that the two shots were followed by another shot from the driver's side and that following the driver's shot, Bubbles dropped to the ground.   According to Small, someone from the crowd — not the car —   started to shoot at his neighbor's house after Bubbles went down.

{¶33} Similar to Small's testimony, Antonio Delaney, Bubbles's brother, testified that after the driver (Robinson) started firing his gun, "that's when Bubbles had dropped." And several other witnesses — at least four other eyewitnesses from Bubbles's group — echoed this testimony, testifying that they saw Bubbles lying on the ground after the driver started shooting.   Although they specifically did not see Bubbles fall at the exact moment, they identified the driver (Robinson) as the only shooter before Bubbles fell.

{¶34} Further, through forensic scientist Andrew Chappell's testimony, the state established that the bullet recovered from Bubbles had the "same class characteristics" of Robinson's firearm, a Smith & Wesson .38 revolver.   In other words, the bullet that killed Bubbles was capable of being fired from the type of firearm used by Robinson.

{¶35} Contrary to Robinson's assertion, construing this evidence in a light most favorable to the state, only one reasonable inference can be drawn:   Robinson shot Bubbles.   To the extent that Robinson argues that this inference is not reasonable based on other evidence contradicting it, such an argument amounts to an attack of the weight of the evidence, which we will address separately under our manifest weight analysis.

**{¶36}** Next, Robinson argues that the state failed to prove that he acted "knowingly." He contends that the evidence only established that he acted "recklessly." We disagree.

**{¶37}** "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

**{¶38}** It is common knowledge that a firearm is an inherently dangerous instrumentality, use of which is reasonably likely to produce serious injury or death. *State v. Widner*, 69 Ohio St.2d 257, 270, 431 N.E.2d 1025 (1982). This court has consistently held that "shooting a gun in a place where there is risk of injury to one or more persons supports the inference that the offender acted knowingly." *State v. Hunt*, 8th Dist. Cuyahoga No. 93080, 2010-Ohio-1419, ¶ 19, citing *State v. Brooks*, 44 Ohio St.3d 185, 192, 542 N.E.2d 636; *see also State v. Ivory*, 8th Dist. Cuyahoga No. 83170, 2004-Ohio-2968, ¶ 6; *State v. Jordan*, 8th Dist. Cuyahoga No. 73364, 1998 Ohio App. LEXIS 5571 (Nov. 25, 1998). Notably, "[e]ven firing a weapon randomly at victims arguably within range of the shooter is sufficient to demonstrate actual intent to cause physical harm." *Ivory* at ¶ 6, citing *State v. Phillips*, 75 Ohio App.3d 785, 600 N.E.2d 825 (2d Dist.1991); *State v. Owens*, 112 Ohio App.3d 334, 678 N.E.2d 956 (11th Dist.1996).

{¶39} Here, Robinson admitted to shooting his gun into the crowd of people. Further, the majority of the eyewitnesses who testified indicated that Robinson fired his gun several times into the crowd and that Bubbles "went down" after Robinson fired. The state presented, through both direct and circumstantial evidence, that Robinson fired his gun out of his car toward Bubbles.

{¶40} As for Robinson's claim that his conduct was merely "reckless" because the crowd had already dispersed, we find his claim unsupported by the record. Based on the collective testimony of the eyewitnesses, a crowd of at least 15 to 20 people was congregated behind Robinson's car when he fired his gun into the crowd. While the scene was definitely chaotic, we cannot say that the evidence established that the crowd had dispersed. To the contrary, one witness testified that she was standing behind the car "in shock" when Robinson started firing toward the crowd. Accordingly, we find that there was sufficient evidence that Robinson acted "knowingly" rather than "recklessly" in firing his gun.

{¶41} Having found that the state presented sufficient evidence to support the single count of felony murder, we overrule Robinson's first assignment of error.

*Separate Five Felonious Assault Counts*

{¶42} In his second assignment of error, Robinson argues that the state failed to present sufficient evidence to support the five felonious assaults with respect to Darylisa Crenshaw, Latima Brown, Kayla Moorer, Devin Delaney, and Antonio Delaney. He argues that the state failed to establish that any of these alleged victims were almost shot

by Robinson or were otherwise "in the line of fire." Without evidence that they were "in the line of fire," Robinson contends that the convictions cannot stand. In support of this argument, Robinson relies on the Ohio Supreme Court's decision in *State v. Mills*, 62 Ohio St.3d 357, 582 N.E.2d 972 (1992). *Mills*, however, is distinguishable from this case.

{¶43} In *Mills*, the defendant had been accused of committing several felonious assaults during the commission of a bank robbery. The Supreme Court vacated one of those counts against a teller who was standing off to the side of the line of fire and behind a teller counter. In distinguishing the *Mills* case from those felonious assaults involving firing into a crowd, this court explained:

> The key factual distinction between *Mills* and this case is the proximity of the shooter to the victim and how that proximity demonstrates an intent to hit a desired target. If a shooter fires a shot at a target standing within point-blank range, it can be inferred that the shooter intends to hit that target to the exclusion of other targets within the periphery. When, as here, the targets are considerably farther away, and aiming is made more difficult because the shooter is in a moving vehicle, it can reasonably be inferred that the shooter is intending to shoot within a much wider target range. Hence, anyone standing within that wider target range can be an intended target, regardless of whether the shooter hits the mark. Of course, the greater the range and difficulty of the shot, the less likely it may be that a bullet will hit its intended target. But that fact alone does not overcome an intent to hit a target — it simply makes a successful shot that much more unlikely.

*Ivory*, 8th Dist. Cuyahoga No. 83170, 2004-Ohio-2968, ¶ 8.

{¶44} We find the reasoning of *Ivory* applicable in this case. We further note that the state's prosecution of the felonious assault counts was not limited to Robinson's conduct only. The charges against Robinson were also prosecuted under an aiding and abetting theory, namely, that Robinson was an accomplice to Logan's firing of his gun into

the crowd. With that in mind, we turn to whether the state presented sufficient evidence that Logan or Robinson committed a felonious assault against each of the five named victims. After a careful review of the evidence, and construing the evidence in a light most favorably to the state, we find sufficient evidence to support the convictions.

{¶45} The record reveals that chaos erupted amongst a crowd of approximately 20 people in the street immediately after Logan started shooting. In turn, most of the crowd began to run toward Euclid Avenue to avoid being hit from the shots fired by Logan and Robinson. The state offered both direct and circumstantial evidence establishing that both Logan and Robinson shot their firearms back into the crowd — Logan's in the direction straight back toward Euclid Avenue, and Robinson's in the direction closer to the tree lawn where Bubbles fell. All five victims were behind the car and in the crowd that was fired upon.

{¶46} Given the chaotic scene and the numerous shots fired, we find this testimony sufficient to establish that Robinson either as the principal offender or as an aider or abetter "knowingly * * * attempt[ed] to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2).

{¶47} According, we overrule the second assignment of error.

*Discharging a Firearm on or Near Prohibited Premises*

{¶48} Robinson was convicted of the first-degree felony of discharging a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3) and (C)(4). The state therefore was required to prove that (1) Robinson discharged a firearm upon or over a

public road or highway; and (2) the discharge of the firearm "caused serious physical harm to any person." *Id.* The indictment named Bubbles as the victim.

{¶49} Although Robinson concedes that he shot his firearm from a vehicle upon a public road, he argues that the state failed to prove that his shot hit Bubbles to elevate the crime to a first-degree felony. He raises the same arguments that we have already rejected under his sufficiency challenge to the felony murder count. Accordingly, we overrule the third assignment of error.

Manifest Weight of the Evidence

{¶50} In his fourth assignment of error, Robinson argues that all his convictions are against the manifest weight of the evidence. We disagree.

{¶51} In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. When reviewing a claim challenging the manifest weight of the evidence, "the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). After reviewing the entire record, the reviewing court must

> weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*Id.*

*Felony Murder*

{¶52} In arguing that his conviction for felony murder is against the manifest weight of the evidence, Robinson relies principally on the same argument that he raised in his first assignment of error, namely, that the eyewitness testimony linking him to the murder is not credible because the physical evidence excludes him. Specifically, Robinson points to the testimony of the deputy medical examiner, Dr. McCollom, who stated that Bubbles had "stippling" on her face, which is indicative that the shooter was within three feet from her. Robinson contends that this testimony excludes him as the shooter "because he shot from his car which was on the east side of a one-way street near 1826 Garfield Road, whereas [Bubbles] was shot on the west side of the street on a grassy area along the sidewalk and adjacent to the fence opposite 1818 Garfield." He further argues that most eyewitnesses testified that Bubbles was running away from the car; thus, if he had shot her from his car, the entrance wound would have been in the back of her head, not her face.

{¶53} While we acknowledge that Robinson raises a compelling argument that Bubbles may have been killed by someone from her own group during crossfire, we still cannot say that the jury "lost its way" in this case.

{¶54} First, although we agree that the record evidences Bubbles's location at the time of her fall from the fatal shooting, the evidence does not conclusively establish Robinson's exact location at the time that he fired his gun. Whereas Robinson contends that his shot would have been fired at least 80 feet south and 20 feet west from Bubbles, other testimony at trial established that Bubbles was much closer to Robinson's car. For

example, Antonio Delaney testified that Bubbles was approximately 15 feet from the car. Additionally, although there was testimony that Bubbles was running away from the car after the first shots were fired, we note that Bubbles was shot "lateral to her right eye." Despite running away, Bubbles could have been shot if she had turned her head to look back after the pause in the first set of shots. Finally, we must emphasize that, aside from some of the occupants in Robinson's car, almost all of the eyewitnesses either testified that there was no shooting from the crowd toward the car or that the only shooting from the crowd occurred after Bubbles had fallen down. Notably, even Russell Stokes, who was not a party to Bubbles's group, testified to this fact. We find these facts to be important when considering the weight of Dr. McCollom's testimony.

**{¶55}** Even assuming that Bubbles was not within three feet of Robinson when he fired his gun outside his car window, we still cannot say that a manifest miscarriage of justice has occurred. Indeed, Robinson's manifest weight of the evidence challenge is premised on the notion that Dr. McCollom's testimony regarding the existence of stippling and the corresponding distance of the shooter was infallible. The jury, however, was free to disbelieve Dr. McCollom's testimony. Further, Robinson's argument ignores the very function of the jury, namely, to resolve conflicts in the evidence. The jury heard from several witnesses whose testimony could reasonably be construed to mean one thing: Robinson shot and killed Bubbles.

**{¶56}** It is well settled that the credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts primarily to resolve. *State v.*

*DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967).   As the Second District has

explained:

> [B]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.

*State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709 (Aug. 22,

1997).

{¶57} Moreover, we find Robinson's challenge to his felony murder conviction

flawed for another reason: the jury didn't have to believe that Robinson's shot actually

killed Bubbles to convict him of the felony murder count.   Under Ohio's felony-murder

doctrine, "a defendant may be held criminally liable for the unintended death that results

from the commission of a first or second degree felony."   *State v. Tuggle*, 6th Dist. Lucas

No. L-09-1313, 2010-Ohio-4162, ¶ 101.   In *State v. Dixon*, 2d Dist. Montgomery No.

18582, 2002 Ohio App. LEXIS 472 (Feb. 8, 2002) (abrogation recognized on other

grounds), the court explained that under the "proximate cause theory" of felony murder:

> [I]t is irrelevant whether the killer was the defendant, an accomplice, or some third party such as the victim of the underlying felony or a police officer.   Neither does the guilt or innocence of the person killed matter.   A defendant can be held criminally responsible for the killing regardless of the identity of the person killed or the identity of the person whose act directly caused the death, so long as the death is the "proximate result" of defendant's  conduct in committing the underlying felony offense; that is, a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience.

*Dixon* at \*14-15, citing *State v. Chambers*, 53 Ohio App.2d 266, 269, 373 N.E.2d 393 (9th Dist.1977). *See State v. Bumgardner*, 2d Dist. Greene No. 97-CA-103, 1998 Ohio App. LEXIS 3856 (Aug. 21, 1998); and *State v. Lovelace*, 137 Ohio App.3d 206, 738 N.E.2d 418 (1st Dist.1999).

**{¶58}** Here, the testimony offered at trial established at a minimum that Robinson fired his gun toward Bubbles. Even if his bullet missed Bubbles, this does not protect him from criminal liability. We find that it is foreseeable that someone in a crowd, gathered for a fight, will shoot back if first fired upon. *See State v. Abdi*, 4th Dist. Athens No. 09CA35, 2011-Ohio-3550. Notably, "even intervening criminal conduct does not prevent an offender's actions from being the proximate cause so long as that intervening conduct was foreseeable." *Id.* at ¶ 76, citing *Lovelace* at 219 (holding that police officer's criminal conduct during a high-speed chase, which directly caused a motorist's death, was foreseeable, and therefore, defendant could be held criminally liable for proximately causing the motorist's death). Thus, we find that the conviction must stand because (1) the weight of the evidence establishes that Robinson committed a felonious assault against Bubbles, even if it was an attempt to inflict serious physical harm by virtue of shooting in her direction, and (2) his felonious assault proximately caused her death, even if it was through the crossfire retaliating back.

*Felonious Assault Counts*

**{¶59}** Robinson argues that his felonious assault convictions are against the manifest weight of the evidence for the same reasons raised in his sufficiency challenge.

Given that there is no evidence contradicting the testimony of the victims supporting the five counts, we find his argument has no merit and overrule it.

*Discharging a Firearm on or Near Prohibited Premises*

{¶60} Relying on the same reasons he raised in his manifest weight challenge of his felony murder conviction, Robinson argues that his conviction of first degree discharging a firearm on or near prohibited premises cannot stand. He claims that the jury's acquittal of the "drive-by-shooting" firearm specification evidences that it "lost its way" in deciding this count.

{¶61} Unlike the felony murder count, the state had to prove beyond a reasonable doubt that Robinson's bullet shot Bubbles. We acknowledge that this is a very close call given Dr. McCollom's testimony placing the shooter within three feet of Bubbles and the fact that no one placed Bubbles within three feet of Robinson. But despite this obvious conflict, we still cannot say that the jury's verdict here defies logic and constitutes a manifest miscarriage of justice. Again, as discussed above, the jury was free to disbelieve Dr. McCollom. Indeed, the jury heard from several eyewitnesses whose testimony could be reasonably construed to mean one thing: Robinson shot and killed Bubbles.

{¶62} Accordingly, having found that Robinson's convictions are not against the manifest weight of the evidence, we overrule the fourth assignment of error.

Aiding and Abetting Instruction

{¶63} Robinson argues in his fifth assignment of error that the trial court erred in instructing the jury that it could find him guilty of aiding and abetting Jeremy Logan when

there was no evidence that he aided and abetted Logan's criminal conduct. Robinson contends that the state failed to present any evidence that he "provided any assistance or encouragement to Logan and shared his culpable mental state at the time Logan fired his gun."

> To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.

*State v. Johnson*, 93 Ohio St.3d 240, 245-246, 754 N.E.2d 796 (2001). The defendant's intent may be inferred from the circumstances surrounding the crime. *Id.* at 246.

{¶64} Additionally, the defendant's mere association with the principal offender is not enough to prove complicity. *State v. Mootispaw*, 110 Ohio App.3d 566, 570, 674 N.E.2d 1222 (4th Dist.1996). The defendant must have had some level of active participation by way of providing assistance or encouragement. *State v. Nievas*, 121 Ohio App.3d 451, 456, 700 N.E.2d 339 (8th Dist.1997); *State v. Sims*, 10 Ohio App.3d 56, 58, 460 N.E.2d 672 (8th Dist.1983).

{¶65} Robinson argues that the aiding and abetting instruction was not proper because the only evidence shows that Robinson provided assistance after Logan fired his gun, which he contends only evidences proof of an "accessory after the fact." We disagree.

{¶66} As recognized by the Ohio Supreme Court in *Johnson*, the defendant's "'participation in criminal intent may be inferred from presence, companionship and

conduct before and after the offense is committed.'"  *Id.* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971).  The evidence at trial revealed that Logan always carried a gun after having been shot and that Robinson specifically asked Logan to accompany him to The One Way "because he didn't want to be up there by himself in a fight."  The state offered the testimony of Stephanie Robinson, who testified that she saw the passenger pull out a gun after being punched but that the passenger's gun "jammed" and the "driver [got] it to work."

**{¶67}** Additionally, Paul Small testified that, immediately after Logan was punched and prior to Logan firing his gun, the car pulled slightly forward.  Similarly, another witness testified that the car moved slightly forward while the passenger "inched out" his window before starting to fire.  This testimony reveals that Robinson, who was driving the car, did not drive away; instead, he operated the vehicle in such a manner to allow Logan to position himself on the car door window prior to Logan firing his gun.  This evidence reveals that Robinson shared in Logan's criminal intent to fire the firearm out of the vehicle and that he assisted him in doing so.

**{¶68}** Based on this collective evidence, we cannot say that the trial court erred in giving an aiding and abetting instruction. The fifth assignment of error is overruled.

Failure to Grant a Mistrial

**{¶69}** In his sixth assignment of error, Robinson argues that the trial court erred in refusing to give a curative and in failing to grant a mistrial after a witness testified that Robinson was "in prison."  Specifically, Robinson points to the statement made by B.D.,

one of the occupants in Robinson's car at the time of the shooting. Robinson contends that B.D.'s statement was so prejudicial because it severely undermined his "attempt to maintain the presumption of innocence" by exercising his right to be tried in civilian clothing. In support of this argument, Robinson relies on this court's decision in *State v. Collins*, 8th Dist. Cuyahoga No. 89808, 2008-Ohio-3016. *Collins*, however, is factually distinguishable from this case.

{¶70} In *Collins*, the trial judge, prior to voir dire, admonished the jury with the following: "Don't talk to your fellow jurors about how you answered the questionnaire. Do not talk about the case at all. John and Pinkey and Harvey and Ben, you might see us at the cafeteria, the defendant is incarcerated, you're not going to see him in the cafeteria, I just want you to know that for security purposes * * *."

{¶71} Defense counsel subsequently moved for a mistrial on the grounds that Collins had dressed in a suit for the express purpose of not letting the jury know that he was incarcerated, something that the judge's comments severely undermined, and that the trial judge's comments suggested that Collins was incarcerated because he was a dangerous person. The trial court denied the motion.

{¶72} On appeal, we held that the trial court abused its discretion in denying the motion for a mistrial. *Id.* at ¶ 14. Recognizing the well-established principle that a defendant who is compelled to stand trial wearing identifiable prison clothing suffers prejudice that undermines the presumption of innocence, this court found the same principle was applicable in Collins's case. *Id.* at ¶ 16. Since Collins exercised his right

to wear a suit to trial, "the court must not undermine his attempt to maintain the presumption of innocence as the trial proceeds." We further found that "the trial court not only made the initial error of commenting on [Collins's] incarceration, but he compounded the problem exponentially by adding that it was for 'security purposes.'" *Id.* at ¶ 17. Finding that such a statement leads to the unavoidable inference that Collins is a dangerous person, this court held that Collins was entitled to a new trial. *Id.*

{¶73} This is not a case where the trial judge commented on Robinson's incarceration at the time of trial. Instead, the record reveals that B.D., age 17 at the time of trial, made a fleeting reference to Robinson being "in prison" while answering the prosecutor's question regarding the nature of the conversations that she had with Robinson following the shooting. She responded: "I mean he show no effect. He's in prison." The answer was not responsive to the question asked and clearly not intentionally elicited by the state.

{¶74} Contrary to Robinson's assertion, we find a distinct difference from a comment made by the judge in *Collins*, 8th Dist. Cuyahoga No. 89808, 2008-Ohio-3016 — a person whose position alone carries considerable credibility and weight in the eyes of a jury — to an unresponsive, fleeting comment made by a teenager. Further, unlike the facts of *Collins*, the statement was not further compounded by another prejudicial statement. Instead, as soon as the statement was made, the trial judge immediately sustained defense counsel's objection. While we acknowledge that the trial judge should have given a curative instruction as requested by defense counsel, we find that the failure

to do so amounts to harmless error. *See, e.g., State v. Lytle*, 48 Ohio St.2d 391, 358 N.E.2d 623 (1976), paragraph three of the syllabus; *State v. Brown*, 65 Ohio St.3d 483, 605 N.E.2d 46 (1992) (An error is harmless and not grounds for reversal where there is no reasonable probability that unlawful testimony contributed to the accused's conviction.).

{¶75} The sixth assignment of error is overruled.

Prosecutorial Misconduct

{¶76} In his seventh assignment of error, Robinson argues that he was denied his due process right to a fair trial as a result of prosecutorial misconduct. He argues that the prosecutor's statements in his final closing argument were calculated "to improperly influence the jury with arguments that had absolutely no basis in the evidence."

{¶77} The standard of review for prosecutorial misconduct is whether the comments and questions by the prosecution were improper, and, if so, whether they prejudiced appellant's substantial rights. *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). Prosecutorial misconduct will not provide a basis for reversal unless the misconduct can be said to have deprived the appellant of a fair trial based on the entire record. *State v. Lott*, 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 92, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶78} There was no objection to the alleged instances of prosecutorial misconduct; therefore, Robinson has waived all but plain error. *State v. Bryan*, 101 Ohio St.3d 272,

2004-Ohio-971, 804 N.E.2d 433, ¶ 175; *State v. Ballew*, 76 Ohio St.3d 244, 254, 667 N.E.2d 369 (1996). The plain error rule is to be invoked only under exceptional circumstances in order to avoid a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 95, 372 N.E.2d 804 (1978). Plain error does not occur unless, but for the error, the outcome of the trial clearly would have been different. *Id.* at 97; Crim.R. 52(B).

{¶79} According to Robinson, the most important piece of exculpatory evidence in this case was the testimony of the medical examiner, Dr. McCollom, indicating that the victim was shot in the face at close range based on the presence of "stippling." Robinson contends that the prosecutor improperly attacked this testimony in closing argument by misconstruing the evidence and by intentionally confusing the jury as to the testimony of other experts.

{¶80} Although prosecutors are entitled to considerable latitude in opening and closing arguments, they must nevertheless avoid insinuations and assertions calculated to mislead. *Lott*, 51 Ohio St.3d at 166, 555 N.E.2d 293. "They may not express their personal beliefs or opinions regarding the guilt of the accused, and they may not allude to matters not supported by admissible evidence." *Id.* The prosecutor is, however, permitted to fairly comment on the credibility of witnesses based on the witnesses' testimony at trial. *State v. Williams*, 8th Dist. Cuyahoga No. 90739, 2012-Ohio-1741, ¶ 12, citing *State v. Price*, 60 Ohio St.2d 136, 140, 398 N.E.2d 772 (1979). Courts must review the statement within the context of the entire trial. *Id.*

   1. *Remarks that Dr. McCollom is not a ballistics expert*

**{¶81}** Robinson first points to the prosecutor's statements attacking Dr. McCollom's qualifications to render an opinion on stippling and corresponding distance of the shooter, wherein the prosecutor emphasized first that Dr. McCollom is "qualified as an expert in the area of forensic pathology, not ballistics, okay," and then later reiterated again that the "pathologist is not a ballistics expert." Robinson argues that the prosecutor's remarks were improper because there was no evidence that Dr. McCollom was not qualified to offer her scientific opinion regarding the stippling, and the prosecutor's personal opinion of her testimony was improper. We disagree.

**{¶82}** While it is true that the defense effectively elicited testimony from Dr. McCollom regarding stippling and the corresponding implication of a close range shooter, which the prosecutor never tried to contradict or impeach through re-direct of Dr. McCollom, we do not believe that alone prohibits the prosecutor from commenting on the credibility of this testimony. Notably, Dr. McCollom was not offered as a ballistics expert, nor did she hold herself out to be one. The prosecutor's remarks on this issue therefore were not improper.

2. *Testimony mocking the defense's argument*

**{¶83}** Robinson further contends that the prosecutor "denigrated its own expert witness and intentionally misconstrued the defense argument in an attempt to make it ridiculous." He complains of the following remarks:

> [T]his testimony about the stuff that comes flying out of the end of a gun, this burned residue and this powder, a couple of dots around her face as if, you know, the big game changer, there is a real killer out there * * * [and] shoots Bubbles in the face, one of her friends, somebody must have wanted

to do her in, right? If that's the defense, that's a bad defense, really bad. Another killer.

**{¶84}** While we find the prosecutor's remarks to be obnoxious, we cannot say that it rises to the level of prosecutorial misconduct. The prosecutor was giving his take on the defense's theory as stated in the closing argument. And even assuming that such characterization was improper, we find no basis to believe that these statements affected the outcome of the trial.

3. *Misstating the relevance of other experts' testimony and mischaracterizing their testimony*

**{¶85}** Robinson also argues that the prosecutor improperly implied that Dr. McCollom's testimony was somehow rendered invalid because Robinson did not ask the firearms expert any questions to corroborate McCollom's testimony. Robinson contends that these statements improperly imply (1) that Andrew Chappell, the firearms expert, would have contradicted Dr. McCollom's testimony — something that was never established at trial — and further (2) that the burden somehow rested with the defense to disprove the state's case. Robinson specifically points to the following remarks:

> But right after [Dr. McCollom], we had a ballistics expert up here and testifying, right. A guy, [defense counsel] says, is a terrific expert, well qualified. Well, ask him the question, right? Ask him the question about the distance of this gunshot residue. Why don't you.
>
> * * *
>
> [The defense] want to wrap their arms around [Dr. McCollom] because she said this bit about fluid distance of gunshot residue and get the ballistics expert up here, ask Andy [Chappell] some questions. You know, ask Andy some questions about that. * * *

**{¶86}** He further points to the prosecutor's characterization of the testimony of the trace evidence expert, Martin Lewis, as not being entirely accurate and misleading. Although Lewis testified on cross-examination that the FBI no longer tests for gunshot residue at their laboratory, he specifically denied that the decision had anything to do with the reliability of gunshot residue testing. Relying on Lewis's testimony in closing argument, the prosecutor stated this testimony illustrated that "the stuff" Dr. McCollom testified to "is mushy." The prosecutor further elaborated: "It's all the same stuff. It blasts out, FBI doesn't use it any more, we know that. It's just murky. This stuff, it's like that [Lewis] testified to."

**{¶87}** We find these highlighted comments by the prosecutor to be improper. There was no evidence that Chappell would have contradicted McCollom's testimony, and there is no burden upon the defense to disprove the state's case. We further agree with Robinson that the prosecutor's argument related to the gunshot residue was misleading because Lewis did not testify that gunshot residue testing was murky or unreliable and because it mixes two very different types of scientific analysis, namely, gunshot residue testing versus the forensic significance of stippling.

**{¶88}** We, however, cannot say that these comments deprived Robinson of a fair trial or impacted the outcome of the trial. First, while appellant's counsel has effectively highlighted these comments, these comments must be taken in context with the entire closing argument. These comments were part of a long closing argument where the prosecutor also repeatedly emphasized the jury to follow the jury instructions, *e.g.*, "Please

don't take anything I say as the gospel, just use the evidence and instructions, throw anything I say out the window." Notably, as stated above, defense counsel did not object to any of these remarks. When considered in context, we do not believe that any of these comments would unduly influence the jury in the performance of their job.

{¶89} Second, the trial court specifically instructed the jury that opening statements and closing arguments of counsel were not evidence, and that the jury was to decide the case solely on the evidence presented. *See State v. Sheffey*, 8th Dist. Cuyahoga No. 98944, 2013-Ohio-2463, ¶ 50. We have no basis to conclude that the jury did not follow this instruction.

{¶90} The seventh assignment of error is overruled.

Ineffective Assistance of Counsel

{¶91} In his eighth assignment of error, Robinson argues that he was denied effective assistance of counsel because his trial counsel failed to object to the prosecutor's improper remarks discussed in the preceding assignment of error.

{¶92} To establish ineffective assistance of counsel, a defendant must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus.

{¶93} Having already found that the improper remarks made by the prosecutor in closing argument would not have changed the outcome of the trial, we cannot say that Robinson was prejudiced by his defense counsel's failure to object.

{¶94} The eighth assignment of error is overruled.

Facebook Photograph

{¶95} In his ninth assignment of error, Robinson argues that the trial court deprived him of a fair trial by admitting an irrelevant and prejudicial Facebook photograph of himself and Logan in violation of Evid.R. 402 and 403.

{¶96} Evid.R. 402 provides that "[e]vidence which is not relevant is not admissible." Under Evid.R. 403(A), relevant evidence is not admissible "if its probative value is substantially outweighed by the danger of unfair prejudice[.]" Further, the admission of irrelevant evidence that substantially prejudices a party requires a new trial. *State v. Yost*, 33 Ohio App.3d 173, 514 N.E.2d 940 (12th Dist.1986).

{¶97} We review a trial court's decision regarding the admission of such evidence under an abuse of discretion standard. *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus.

{¶98} The state offered the Facebook photograph through the testimony of Det. Reginald Holcomb, who explained that the photograph led to the police's initial discovery of the driver's name, who had previously only been identified as "J.R." The state argued for its admission "to show the procedure, what led the detectives to the identity of the driver." Robinson contends that the photograph was irrelevant because the photograph

"does not make the existence of a fact of consequence to the action more or less probable." Specifically, Robinson points out that he admitted to the police that he was the driver, and therefore, its significance as part of the police procedure in identifying his name was irrelevant. We agree.

**{¶99}** But we find the admission of the photograph to be harmless. Although Robinson contends that he and Logan look "like thugs," and the photograph improperly suggests that he "was the type of person who would engage in criminal activity," we disagree. The photograph depicts Logan and Robinson standing together. Logan is smiling with both his arms up in front of him, and Robinson is looking down with his left hand up by his face. We simply fail to see any prejudice by the admission of the photograph.

**{¶100}** The ninth assignment of error is overruled.

<u>Inconsistent Verdicts</u>

**{¶101}** Robinson argues in his tenth assignment of error that the jury's verdict is inconsistent because it found him guilty of felony murder, felonious assault, and discharge of a firearm on or near a prohibited place, but not guilty of the five-year firearm specification attached to these counts. He contends that his due process rights were violated because the jury delivered inconsistent verdicts within the same count.

**{¶102}** Generally, "[t]he several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to

the same count." *State v. Lovejoy*, 79 Ohio St.3d 440, 683 N.E.2d 1112 (1997), paragraph one of the syllabus. Robinson argues that based upon the Ohio Supreme Court's holding in *State v. Evans*, 113 Ohio St.3d 100, 2007-Ohio-861, 863 N.E.2d 113, a firearm specification is considered dependent on the underlying charge, and thus the two should be considered the same count. This court, however, has consistently rejected this argument. *See, e.g., State v. Williams*, 8th Dist. Cuyahoga No. 95796, 2011-Ohio-5483, ¶ 41; *State v. Hardware*, 8th Dist. Cuyahoga No. 93639, 2010-Ohio-4346, ¶ 15. Indeed, "a jury's general finding of guilty is not invalid where, * * * there is a conviction on the principal charge * * * and an acquittal on the accompanying firearm specifications." *State v. Glenn*, 1st Dist. Hamilton No. C-090205, 2011-Ohio-829, ¶ 70.

{¶103} Here, the evidence supported the felony murder, felonious assault, and the discharge of a firearm on or near a prohibited place, the court instructed on the specifications independently and separately, and the convictions on these counts were not dependent upon a finding on the specifications. Accordingly, consistent with this court's precedent, we overrule the tenth assignment of error.

<u>Felony Murder Merger Doctrine</u>

{¶104} In his eleventh assignment of error, Robinson argues that his conviction for felony murder should be vacated because it is predicated on the underlying offense of felonious assault. He claims that permitting felonious assault that causes death to serve as the predicate for felony murder "effectively eliminates the purposeful murder statute from the books" and violates the common law felony murder merger doctrine.

{¶105} As recognized by other states, the independent-felony/merger doctrine requires that the underlying felony be independent of the killing, and therefore precludes certain particularly dangerous felonies, such as assault with a deadly weapon, from qualifying as the underlying felony. *See State v. Mays*, 2d Dist. Montgomery No. 24168, 2012-Ohio-838, ¶ 8 (discussing felony murder merger doctrine as applied in other states). As the California Supreme Court has explained, the limitation "is premised upon the concern that it 'would subvert the legislative intent for a court to apply the felony-murder rule automatically to elevate all felonious assaults resulting in death to second degree murder even where the felon does not act with malice.'" *People v. Robertson*, 34 Cal.4th 156, 170, 95 P.3d 872 (2004), quoting *People v. Hansen*, 9 Cal.4th 300, 314, 885 P.2d 1022 (1994).

{¶106} We understand the criticisms of the felony-murder rule, namely, that it requires no proof of intent to kill despite imposing liability for murder. We likewise recognize that other states have sought to minimize its application through the adoption of the independent-felony/merger doctrine. Ohio, however, has not. As consistently recognized by Ohio courts, "'in adopting R.C. 2903.02(B) the General Assembly rejected the independent felony/merger doctrine.'" *Mays* at ¶ 10, quoting *State v. Cherry*, 9th Dist. Summit No. 20771, 2002-Ohio-3738, ¶ 27; *see also State v. Pickett*, 1st Dist. Hamilton No. C-000424, 2001 Ohio App. LEXIS 5549 (Dec. 14, 2001); *State v. Hayden*, 11th Dist. Lake No. 99-L-037, 2000 Ohio App. LEXIS 3198 (July 14, 2000). Indeed, "R.C. 2903.02(B) evidences a clear legislative intent to subject those who commit the most

serious felonies to liability for murder, where commission of those felonies results in death." *Cherry* at ¶ 43.

{¶107} Accordingly, because Ohio does not recognize the felony-merger doctrine and R.C. 2903.02(B) has been repeatedly upheld as constitutional, we find no merit to Robinson's eleventh assignment of error and overrule it.

### Cumulative Error

{¶108} In his twelfth assignment of error, Robinson argues that he was denied a fair trial by virtue of the cumulative effect of the errors committed during his trial. We disagree.

{¶109} Pursuant to the cumulative error doctrine, the existence of multiple errors, which may not individually require reversal, may violate a defendant's right to a fair trial. *State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000), citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987). To find cumulative error, we first must first find multiple errors committed at trial and determine that there is a reasonable probability that the outcome below would have been different but for the combination of the harmless errors. *State v. Williams*, 8th Dist. Cuyahoga No. 94261, 2011-Ohio-591, ¶ 25.

{¶110} In this case, Robinson received a fair trial, and any errors were harmless or nonprejudicial, cumulatively as well as individually. Accordingly, we overrule the twelfth assignment of error.

### Allied Offenses

{¶111} In his thirteenth assignment of error, Robinson argues that the trial court erred by convicting and sentencing him to consecutive sentences on allied offenses of similar import. He contends that the crimes of felony murder against Bubbles (Count 2) and discharging a firearm upon or over a public road, causing serious physical harm to Bubbles (Count 10), are allied offenses and should have merged in this case. We agree.

{¶112} When a defendant's conduct results in the commission of two or more "allied" offenses of similar import, that conduct can be charged separately, but the defendant can be convicted and sentenced for only one offense. R.C. 2941.25(A). In determining whether offenses merge, we consider the defendant's conduct. *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶ 44. "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" *Id.* at ¶ 49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, ¶ 50 (Lanzinger, J., dissenting). If we answer both questions affirmatively, then the offenses are allied offenses of similar import and will be merged. *Johnson* at ¶ 50.

{¶113} The underlying felony supporting Robinson's felony murder conviction is felonious assault. This court has recently held that it is possible to commit, by the same conduct, felonious assault with a deadly weapon and discharge of a firearm on or near prohibited premises. *See State v. Melton*, 8th Dist. Cuyahoga No. 97675, 2013-Ohio-257, ¶ 54. Here, the first prong of *Johnson* is met. As for "whether the offenses were

committed by the same conduct," we find that they were. These two separate counts involve a single victim — Bubbles — who suffered a single, fatal gunshot wound fired by Robinson. Accordingly, we sustain this assignment of error.

{¶114} Based on our resolution of the thirteenth assignment of error, we find Robinson's two remaining assignments of error to be moot.

### Conclusion

{¶115} In summary, we affirm Robinson's convictions but vacate the imposition of consecutive sentences on the felony murder and first degree discharging a firearm on or near prohibited premises count. Because these are allied offenses of similar import, these two offenses should have merged. On remand, the state shall elect which charges merge into the other for sentencing.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed in part, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

It is ordered that appellee and appellant share the costs herein taxed.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, PRESIDING JUDGE

PATRICIA ANN BLACKMON, J., and
TIM McCORMACK, J., CONCUR

APPENDIX

I.   Robert Robinson's conviction for felony murder is not supported by legally sufficient evidence as required by state and federal due process.

II.   Robert Robinson's convictions for felonious assault are not supported by legally sufficient evidence as required by state and federal due process.

III.   Robert Robinson's conviction for the first-degree felony of discharging a firearm on or near prohibited premises is not supported by legally sufficient evidence as required by state and federal due process.

IV.    Robert Robinson's convictions are against the manifest weight of the evidence.

V.   The trial court erred in instructing the jury that it could find Robinson guilty of aiding and abetting Jeremy Logan when there was no evidence that Robinson aided and abetted Logan's criminal conduct.

VI.   The trial court erred in refusing to give a curative instruction and in failing to grant a mistrial after a witness testified that Robinson was "in prison."

VII.   Robert Robinson was denied his due process right to a fair trial as a result of prosecutorial misconduct.

VIII.   Robert Robinson was denied effective assistance of counsel in violation of the sixth and fourteenth amendments to the United States Constitution and Article I, Section 10, of the Ohio Constitution.

IX.   The trial court erred and violated Robert Robinson's constitutional right to a fair trial when it admitted an irrelevant and prejudicial photograph.

X.    Robert Robinson's convictions violate due process because they are inconsistent with the not guilty verdicts within the same counts on the 5-year firearm specifications.

XI.   Robert Robinson's conviction for felony murder based on the predicate offense of felonious assault violates the common law felony murder merger doctrine and Robinson's rights under the sixth and fourteenth amendments to the United States Constitution and Section 10, Article 1 of the Ohio Constitution.

XII.    The cumulative errors committed in this case deprived Robert Robinson of a fair trial.

XIII.    The trial court erred by convicting and sentencing Robert Robinson to consecutive sentences on allied offenses of similar import.

XIV.    The trial court erred by convicting and sentencing Robert Robinson for a first-degree felony violation of discharge of firearm on or near prohibited premises when the verdict form failed to identify the degree of the offense or the aggravating elements as required by R.C. 2945.75.

XV.    The trial court imposed a sentence contrary to law and violated Mr. Robinson's right to due process when it ordered consecutive sentences without stating the requisite statutory findings on the record.