[Cite as *In re I.N.R.*, 2014-Ohio-3582.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 99983**

---

## IN RE:   I.N.R.

A Minor Child

---

**JUDGMENT:**
AFFIRMED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL-12107413

**BEFORE:**   Blackmon, J., Boyle, A.J., and Stewart, J.

**RELEASED AND JOURNALIZED:**   August 21, 2014

**ATTORNEYS FOR APPELLANT**

Timothy Young
State Public Defender

By:   Brooke M. Burns
Sheryl Trzaska
Assistant State Public Defenders
250 East Broad Street, Suite 1400
Columbus, Ohio 43215


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By:   Justin P. Rudin
Jonathan M. McDonald
Assistant Prosecuting Attorneys
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

PATRICIA ANN BLACKMON, J.:

{¶1} Appellant I.N.R.[1] appeals the judgment of the Cuyahoga County Common

Pleas Court, Juvenile Division, that found him delinquent by reason of committing rape

and assigns the following errors for or review:

> I. The Cuyahoga County Juvenile Court violated I.N.R.'s right to due
> process of law when it adjudicated him delinquent of rape without
> sufficient, credible, and competent evidence of penetration, in violation of
> the Fourteenth Amendment to the U.S. Constitution, Article I, Section 16 of
> the Ohio Constitution, and Juvenile Rule 29(e)(4). (T.p. 541; A-1).

> II. The Cuyahoga County Juvenile Court violated I.N.R.'s right to due
> process of law when it adjudicated him delinquent of rape based upon
> unreliable evidence that does not support the finding beyond a reasonable
> doubt, in violation of the Fifth and Fourteenth Amendment to the U.S.
> Constitution, Article I, Section 16 of the Ohio Constitution, and Juvenile
> Rule 29(e)(4). (T.p. 541; A-1).

{¶2} Having reviewed the record and pertinent law, we affirm the juvenile

court's adjudication. The apposite facts follow.

{¶3} On June 18, 2011, through the early morning of June 19, 2011, sisters, A.H.

and S.H., both students at Normandy High School, had a party while their mother was at

work. The sisters invited between 20-30 classmates including I.N.R., N.S., and A.K. to

the party. The two sisters had beer, vodka, and marijuana at the party. Throughout the

evening, the revelers engaged in a variety of alcohol drinking games.

{¶4} Sometime after midnight, A.K. became very inebriated, got sick, vomited,

and A.H. had to put her to bed to sleep off the drunken state. A.K. fell into the bed face

---

[1]The juveniles are referred to herein by their initials in accordance with this court's
established policy regarding non-disclosure of identities in all juvenile cases.

down and passed out. About an hour later, A.H. went to check on A.K., who was still sleeping face down in the bed. A.H. then found N.S. on the bed, who was also inebriated, trying to sleep off his drunken state. A.H. coaxed N.S. off of the bed and out of the room.

{¶5} N.S. later returned to the bedroom, fell asleep beside A.K., awoke to what he would later describe as the sound of "skin slapping on skin" and a voice he recognized as I.N.R. say, "shut up dude." N.S. exited the room and attempted to recount what he had just seen and heard to other guests.

{¶6} When the other guests responded in an uproar and began accusing N.S. of rape, he left the party. N.S. drove to a nearby apartment complex, where he began posting racial slurs on his Facebook page about I.N.R. and I.N.R.'s brother. N.S. also posted information about the incident he witnessed in the bedroom. In addition, N.S. posted suicidal ideations on his Facebook, while he attempted to slit his wrist with his keys.

{¶7} As a result of N.S.'s Facebook postings, Parma police officers and EMS responded to his vehicle for a welfare check. The response units found him despondent, and transported N.S. to Fairview General Hospital for treatment and collection of a DNA sample because of the possible rape.

{¶8} At approximately 5 a.m., Parma police officers arrived at A.H.'s and S.H.'s home. At the time, the officers, based on their earlier conversation with N.S., believed

that he might have raped S.H. Both sisters assured the officers that S.H. was not assaulted.

{¶9} A.H. brought all party guests outside to meet with the officers. A.K. denied having sex with anyone that night. When A.K.'s mother arrived to collect her, the police officers informed her of the possibility that her daughter had been raped and advised her to go to Fairview General Hospital to have a rape kit completed.

{¶10} On April 30, 2012, a complaint was filed in the Cuyahoga County Juvenile Court alleging that I.N.R. was delinquent of rape, in violation of R.C. 2907.02(A)(1)(c), a felony of the first degree if committed by an adult. On March 11, 2013, a bench trial commenced.

## Bench Trial

{¶11} At trial, A.H. testified that she had put A.K. to bed and she was wearing shorts and a top when she fell asleep. A.H. went to check on A.K. sometime later, and found that she was laying in the same position as she was earlier. A.H. testified that while she was checking on A.K., N.S. came in the room and attempted to go to sleep, but she told him she had something to show him in the backyard in order to get him out of the room.

{¶12} A.H. testified that around 3 a.m., she heard rumors that I.N.R. had done something inappropriate to A.K., so she and her sister went to the bedroom to check. They found A.K. still laying face down, but with her shorts and underwear pulled down to

her knees, exposing her buttocks. A.H. testified that after seeing A.K. with her buttocks exposed, she went to the bathroom, found I.N.R. and punched him in the face.

{¶13} S.H. testified that around 3 a.m., N.S. came up to her and another guest and indicated that I.N.R. was raping A.K. She informed her sister A.H. and they both went to the bedroom, where they found A.K. sleeping, but with her buttocks exposed. S.H. pulled back A.K.'s shorts and underwear.

{¶14} N.S. testified that after consuming a considerable amount of beer and vodka, he went to lay down on the bed where A.K. was sleeping. N.S. awoke to the sound of "skin slapping on skin" and when he looked over, he heard a voice that he recognized as I.N.R.'s say "shut up dude."

{¶15} N.S. ran out of the room, found S.H., and attempted to convey what he had seen, but appeared not to be making any sense. N.S. said that other attendees immediately began accusing him of raping A.K. N.S. also said that the hosts and I.N.R.'s older brother, R.R., asked him to leave.

{¶16} N.S. drove to a nearby apartment complex, he sat in his car, began posting racial slurs about I.N.R. and his brother R.R., while attempting to cut his wrist with his car keys. N.S. submitted to a sexual assault exam at Fairview General Hospital.

{¶17} A.K. testified that on the night in question, she had consumed about seven beers, drank a considerable amount of vodka, and played beer pong. A.K. went to sleep after vomiting, and did not believe that she had been penetrated and stated that she had

sexual intercourse before and that "to my knowledge I did not have sexual intercourse that night."

{¶18} Sexual Assault Nurse Examiner, Nadine Thomas, testified that she examined A.K. following the rape allegations. Nurse Thomas collected DNA samples from several places on A.K.'s body. Nurse Thomas collected four vaginal samples; two internally from the vaginal canal and cervix as well as two externally from the exterior of the vagina and personal area. Nurse Thomas also collected four anal swabs, along with swabs of A.K.'s undergarment. Nurse Thomas forwarded the samples to the Bureau of Criminal Investigation ("B.C.I.") for testing. She saw no evidence of penetration.

{¶19} B.C.I. Officer, Pete Tassi, testified that he performed the DNA testing on A.K. and N.S.'s rape kits along with I.N.R.'s "DNA Standard" to test the kits against. Tassi stated that all four of A.K.'s samples arrived in the same container, thus, he could not tell which swabs were internal and which were external. Tassi found semen was on all four swabs, but because he did not do the DNA testing, he did not know whose DNA was on the swabs.

{¶20} The Director of the Forensic Identity Department of Lab Corp., Dr. Shawn Weiss, testified at the trial. He stated that A.K.'s DNA was found on the groin area of N.S.'s boxer shorts along with the DNA of an unidentified male. He also stated that N.S.'s penile sample showed DNA from N.S. and an unidentified male. Dr. Weiss said that I.N.R. was included as the source of the DNA on N.S.'s penile swab and boxer shorts.

**{¶21}** Dr. Weiss testified that I.N.R.'s DNA was found on A.K.'s vaginal swabs, anal swabs, and underwear. Dr. Weiss only tested one of the four vaginal swabs sent from B.C.I., but because the swabs were not separately labeled, he could not tell which ones were internal and which were external.

**{¶22}** Detective Sheridan of the Parma Police Department testified that he interviewed I.N.R. on June 20, 2011. I.N.R. indicated that he had consumed a considerable amount of alcohol at the party, was feeling sick, and went to look for a bathroom. I.N.R. indicated that he mistook A.H.'s bedroom for the bathroom, but when he opened the door and saw N.S. and A.K. in the bed, he closed the door and later found the bathroom. Detective Sheridan stated that I.N.R. denied doing anything sexually to A.K. I.N.R. indicated that he was a virgin, submitted to DNA testing, and indicated that his DNA would not be found on A.K.

**{¶23}** At the end of the state's case in chief, defense counsel motioned the court for acquittal, but the motion was denied.

**{¶24}** I.N.R. testified in his own defense. He stated that he had drank about 7 beers and about 2 glasses of Vodka mixed with juice. He went looking for a bathroom, but opened the door to A.H.'s bedroom, where he saw A.K.'s hand on N.S.'s boxer shorts, near his genitals. I.N.R. said that a third male was present in the room who pulled down A.K.'s shorts and undergarment.

**{¶25}** I.N.R. approached the bed, began masturbating, and then N.S. and the third unidentified male began masturbating as well. I.N.R. ejaculated on the bed, the

unidentified male ejaculated as well, with his semen landing on N.S.'s penis. I.N.R. said that N.S. "freaked out" when the unidentified male's semen landed on his penis, and then ran upstairs. I.N.R. also exited the room, found the bathroom, and sat down to process what had just occurred.

{¶26} Following the trial, the trial court found I.N.R. guilty as charged. The court ordered I.N.R. to participate in treatment at The Village Network and imposed a suspended commitment to the Ohio Department of Youth Services. I.N.R. now appeals.

## Sufficiency of the Evidence

{¶27} In the first assigned error, I.N.R. argues his delinquency adjudication was not supported by sufficient evidence of penetration.

{¶28} It must first be noted that the same standard of review for sufficiency of the evidence applies to juvenile and adult criminal matters. *In re G.R.*, 8th Dist. Cuyahoga No. 90391, 2008-Ohio-3982, citing *In re Washington*, 81 Ohio St.3d 337, 691 N.E.2d 285 (1998). The sufficiency of the evidence standard of review is set forth in *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978), syllabus:

> Pursuant to Criminal Rule 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt.

*See also State v. Apanovitch*, 33 Ohio St.3d 19, 23, 514 N.E.2d 394 (1987); *State v. Davis*, 49 Ohio App.3d 109, 113, 550 N.E.2d 966 (8th Dist.1988).

{¶29} *Bridgeman* must be interpreted in light of the sufficiency test outlined in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence submitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (*Jackson v. Virginia* [1979], 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed.)

{¶30} As previously noted, I.N.R. was adjudicated delinquent of rape in violation of R.C. 2907.02(A)(1)(c) that provide as follows:

(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:

* * *

(c) The other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age;

{¶31} "Sexual conduct" is defined in R.C. 2907.01(A) as:

vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

{¶32} In the instant case, the only element in dispute is penetration. I.N.R. argues that the state presented no credible evidence of penetration, that Nurse Thomas stated that there were no signs of penetration, and that the victim testified that she had not engaged in any sexual activity that night.

**{¶33}** However, the record indicates that the rape kit performed on A.K. that was sent to B.C.I. for testing included four vaginal swabs, four anal swabs, and swabs of A.K.'s undergarments. Two of the vaginal swabs were taken from A.K.'s vaginal canal and cervix.

**{¶34}** Pivotally, the record also indicates that semen was present on all four vaginal swabs and all four anal swabs, as well as on A.K.'s undergarment. In addition, the record indicates that I.N.R.'s DNA was found on A.K.'s vaginal swabs, anal swabs, and undergarments. Thus, because I.N.R.'s DNA was found in A.K.'s vaginal canal and cervix, any rational trier of fact could conclude that I.N.R. penetrated the victim as she lay sleeping, following an episode of binge drinking.

**{¶35}** Although the evidence of penetration is circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *In re N.S.*, 8th Dist. Cuyahoga No. 93153, 2010-Ohio-1057, citing *State v. Basham*, 5th Dist. Muskingum No. CT2007-0010, 2007-Ohio-6995. As such, in reviewing the evidence in a light most favorable to the prosecution, we find that any rational trier of fact could conclude there exists sufficient evidence to sustain I.N.R's delinquency adjudication.

**{¶36}** Nonetheless, I.N.R. maintains the possibility exists that the vaginal swabs were contaminated because they were packaged in the same envelope. However, the undisputed evidence established that only his DNA was found on the swabs when tested. Thus, even with the possibility of contamination, the evidence was sufficient to establish the elements of rape. Accordingly, we overrule the first assigned error.

## Manifest Weight of Evidence

{¶37} In the second assigned error, I.N.R. argues his delinquency adjudication was based on unreliable evidence.

{¶38} In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, the Ohio Supreme Court recently addressed the standard of review for a criminal manifest weight challenge, as follows:

> The criminal manifest-weight-of-the-evidence standard was explained in *State v. Thompkins*, 78 Ohio St.3d 380, 1997 Ohio 52, 678 N.E.2d 541. In *Thompkins*, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. *Id.* at 386, 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. *Id.* at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. *Id.* at 387, 678 N.E.2d 541. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* at 387, 678 N.E.2d 541, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).

{¶39} As discussed in the first assigned error, the state presented circumstantial evidence that I.N.R. penetrated the extremely intoxicated victim while she slept. Nonetheless, I.N.R. suggests his version of how his semen ended up in A.K.'s vaginal canal was more credible.

{¶40} However, this court is mindful that weight of the evidence and the credibility of witnesses are primarily for the trier of fact and a reviewing court must not

reverse a verdict where the trier of fact could reasonably conclude from substantial evidence that the state has proven the offense beyond a reasonable doubt. *State v. Chavez*, 8th Dist. Cuyahoga No. 99436, 2013-Ohio-4700, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), at paragraphs one and two of the syllabus.

{¶41} Further, because the factfinder has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. *State v. Robinson*, 8th Dist. Cuyahoga No. 99290, 2013-Ohio-4375, citing *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709 (Aug. 22, 1997). Thus, the decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.

{¶42} Thus, it was in the province of the juvenile court to conclude that I.N.R.'s version was not credible. The juvenile court, who had the opportunity to see and hear the witnesses, had the peculiar advantage to competently credit or discount the testimony of a particular witness.

{¶43} Consequently, based on the foregoing, we cannot say that the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the adjudications are against the manifest weight of the evidence. Accordingly, we overrule the second assigned error.

{¶44} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution. The trial court's adjudication of delinquency having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of commitment.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

PATRICIA ANN BLACKMON, JUDGE

MARY J. BOYLE, A.J., CONCURS;
MELODY J. STEWART, J., DISSENTS
(SEE ATTACHED DISSENTING OPINION)

MELODY J. STEWART, J., DISSENTING:

**{¶45}** I would sustain either assignment of error in this case and reverse the adjudication of delinquency. I do not find that the state proved beyond a reasonable doubt that the offense of rape occurred because there was insufficient evidence of penetration. Furthermore, although the court could reasonably have found I.N.R.'s testimony to lack credibility, no other evidence supports a finding of rape beyond a reasonable doubt.

**{¶46}** In affirming the trial court's decision that there was sufficient evidence of rape, the majority relies solely on the fact that I.N.R.'s semen was found on all the swabs taken from the rape kit of the victim. Specifically, the majority concludes that since I.N.R.'s DNA was present on swabs taken from the victim's vaginal canal and cervix, any rational trier of fact could conclude that I.N.R. penetrated A.K.'s vagina as she lay sleeping. The majority finds unpersuasive I.N.R.'s argument that the swabs were contaminated because they were all packaged together. The majority reasons that because I.N.R.'s DNA was the only person's found on the swabs, even if they were contaminated by being packaged together, the results were sufficient to establish the crucial element of rape beyond a reasonable doubt: namely that I.N.R. penetrated the victim. This reasoning would be sound if we were confronted only with the question of identity and the act of penetration itself was not an issue. But whether the victim was penetrated is an issue: indeed it is *the issue* in this case. The fact that only I.N.R.'s DNA was found on the swabs, particularly if cross contaminated, does nothing more than destroy the credibility of I.N.R.'s testimony that he did nothing sexual to or with the victim. It does not, however, prove the essential element of rape.

**{¶47}** The fact that the swabs were all packaged together is problematic to say the least. Although I.N.R.'s DNA was present on all of the swabs, there seems to be no way of telling whether samples of his DNA that were on swabs taken from outside the vaginal and anal areas contaminated ones taken from her cervical area. This is important, because to show that the victim was raped by I.N.R., the state had to prove beyond a

reasonable doubt that he penetrated her vagina or anus. The only thing that the circumstantial evidence of the DNA proves beyond a reasonable doubt is that I.N.R. had sexual contact with the victim. Because the victim was not conscious or aware of anything happening to her, this fact, coupled with the DNA evidence would certainly compel the trier of fact to conclude that A.K. was the victim of a sexual assault — even attempted rape. But it is not enough to prove rape.

{¶48} Other evidence presented at trial makes the outcome of this case even more troubling. The sisters who threw the party testified that the victim was lying face down on the bed in the same position all night: she had not been moved. When discovered partially nude, one of the sisters testified that the victim's shorts and underwear were not completely removed, but were around her thighs and knees area and that her legs were not spread apart, they were "just straight."

{¶49} The victim told the sexual assault nurse examiner that she did not believe that she had been penetrated. She repeated this testimony at the trial. She testified that she has had sex before and did not feel as though she was penetrated.

{¶50} The nurse testified that, although the lack of injury does not necessarily mean that one did not have intercourse, she admitted that she saw no indications of sexual intercourse — no redness, lacerations, tearing or swelling — when she examined the victim. She stated, on more than one occasion, that she had no verbal or physical evidence, not even slight, that the victim had been penetrated.

**{¶51}** Finally, the testimony of N.S. sheds no additional light on the question of penetration. N.S.'s limited testimony about what took place in the bedroom is that, while asleep in the bed next to the victim, he was awaken by the sound of skin slapping on skin and a voice he recognized as I.N.R.'s say "shut up dude." He then left the room.

**{¶52}** Reviewing all of the above evidence, a rational trier of fact could certainly find that A.K. was sexually assaulted. Despite I.N.R.'s statement to the police that he did nothing sexual to A.K., and his testimony that he only masturbated near the bed where she lay passed out and partially nude, it is obvious from the swabs taken from her that I.N.R. had some kind of sexual contact with the victim without her consent. But sexual contact is not the same as sexual conduct — a necessary element of rape. I therefore dissent from the majority's decision to affirm the delinquency adjudication.