[Cite as *State v. Tate*, 2024-Ohio-5319.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 113532 |
| v. | : | |
| ROBERT TATE, | : | |
| Defendant-Appellant. | : | |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 7, 2024

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-677598-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Amanda Bizub and Carla B. Neuhauser, Assistant Prosecuting Attorneys, *for appellee.*

The Law Office of Schlachet and Levy, Jaye M. Schlachet, and Eric M. Levy, *for appellant.*

MARY J. BOYLE, J.:

{¶ 1} In this appeal, defendant-appellant, Robert Tate ("Tate"), challenges his convictions for multiple counts of kidnapping, aggravated robbery, rape, and the

accompanying three-year firearm specifications.  He raises the following four assignments of error for review:

> **Assignment of Error I:**  Tate was denied his right to effective assistance of trial counsel or the trial court otherwise committed plain error where Tate was indicted and charged with separate one and three-year firearm specifications in each count and the jury was instructed to make separate findings as to each specification resulting in a violation of multiplicity and improper imposition of three-year firearm sentencing enhancements after Tate was found not guilty on one-year specifications in each count, a conclusive finding that Tate did not possess the firearm.

> **Assignment of Error II:**  Tate's convictions for the three-year firearm specifications in each count must be vacated as inconsistent.

> **Assignment of Error III:**  Tate's convictions were entered absent due process of law where the convictions were entered without sufficient evidentiary support.

> **Assignment of Error IV:**  Tate's convictions were against the manifest weight of the evidence.

{¶ 2}    For the reasons set forth below, we affirm Tate's convictions.

## I.  Facts and Procedural History

{¶ 3}    This incident occurred in 2010.  It remained a cold case for almost 13 years until Tate was ultimately indicted in January 2023 with the following eight counts:  Counts 1 and 8 — kidnapping; Counts 2 and 3 — aggravated robbery; and Counts 4-7 — rape.  Each of the counts carried both a one- and three-year firearm specification.  The charges arise from allegations that Tate kidnapped, raped, and robbed the victim, E.C., on April 8, 2010.  The matter proceeded to a jury trial, at which the following evidence was adduced.

**{¶ 4}** E.C. testified that in 2010, she was in an abusive relationship with her boyfriend. In the months leading up to the incident, her boyfriend wanted her to work as a prostitute for him and his father. E.C. was terrified of her boyfriend and his father and argued with her boyfriend about being a prostitute. E.C. testified that she "did not want to do [it]" and she was "scared to do it." (Tr. 199.) On April 8, 2010, E.C., who was 20 years old at the time, fled her boyfriend's uncle's house after being punched in the mouth the night before for again refusing to work as a prostitute. She told her boyfriend that she needed some fresh air. E.C. was afraid of getting the police involved, so she walked down the street to the gas station at the corner.

**{¶ 5}** According to E.C., she started talking to two men at the gas station, who were later identified as Tate and Toryan Collins ("Collins"). E.C. described them as "two guys that were my age. And they didn't seem very threatening and they seemed like a better place to be where I was just from" so she got into the car with them. (Tr. 201-202.) E.C.'s plan was "to smoke some weed and hang out with these guys, then try to talk them into giving me a ride closer to home." (Tr. 202.) Tate was driving, and Collins was in the passenger seat. E.C. explained that during the car ride, the vibe changed and "it [began] to take more of a sexual route." (Tr. 206.) They stopped at Ronald Edgerson's (Collins's uncle) house "on 91st and Detroit" Avenue in Cleveland, where Collins got into the back seat and E.C. performed

consensual oral sex on him. (Tr. 177.)[1] Afterwards, E.C. decided that she "was going to mess around with [Tate], just not inside of the car," because Tate was too large for it to be comfortable. (Tr. 206-207.) E.C. testified that she went with Tate into the garage, with the sole intention of performing oral sex on him. It was her understanding that she "would give him oral sex the same way that [she] did the other guy, then we would be done and [she] would leave." (Tr. 207.) E.C. further testified that once the garage door closed, it was dark and "the whole feeling in the room changed." (Tr. 207.) Tate was standing behind her. She felt something pressed against her head, and then Tate told her to remove her pants. E.C. believed it was a gun. While she did not see the gun, she described it as "cold and hard" and "weighted." (Tr. 208.) E.C. testified that she has been around guns and is familiar with what they feel like because a couple of weeks prior to the incident, she and her boyfriend were robbed and she was "pistol whipped." (Tr. 209.)

{¶ 6} E.C. "was scared of what would happen if [she] didn't agree" to engage in sexual activity with Tate because she "was a full foot shorter" and 70 pounds lighter than him. (Tr. 212, 240.) According to E.C., she submitted to Tate's sexual demands because he had a gun and was getting "frustrated" that she was resisting his sexual advances. (Tr. 212.) Tate forced E.C. to perform oral sex on him and additionally forced E.C. to perform vaginal and anal sex. On cross-examination, E.C. stated, "I agreed to oral sex. I did not agree to oral sex with a gun, and I did not

_____

[1] Testimony at trial revealed that Edgerson was Collins's (not biological) cousin's father.

agree to being held hostage, and I didn't agree to any of other things that happened to me in that garage." (Tr. 239.) During the attack, Tate took E.C.'s phone, money, and box cutter. He then told E.C. she "was going to have to stay there. [Tate] was going to have [E.C.] work for him. At that point, he started asking if [E.C.] had any friends that [she] could get to work for him as well." (Tr. 211.)

{¶ 7} Following the incident, E.C. waited in the garage until she was certain Tate left. She then escaped by prying a piece of plywood off the door and climbing out. E.C. climbed over a fence behind the house and over another fence until she found a nearby senior living facility, where an employee, Michael, let her inside to speak with the property manager. Michael testified that E.C. was "crying and shaking" and was "screaming that she was being chased, and somebody was after her." (Tr. 247.) E.C. remembers being handed a phone but she was so panicked she could not remember her mother's number to call her. E.C. testified that the next clear memory she has of the incident was at the hospital when she was being examined.

{¶ 8} Cleveland Police Officer Ismael Quintana ("Officer Quintana") responded to an assault call at the senior facility. Officer Quintana found E.C. "curled up in a ball and was crying." (Tr. 261.) E.C. told Officer Quintana that "she had been raped" and her assailant was a black male. (Tr. 259.) E.C. was then taken to the hospital, where a rape kit was collected.

{¶ 9} Collins, who was in prison for a different charge at the time he testified, stated that he has known Tate since he was a teenager. That night, he

observed E.C. when he was at the store. The plan was to pay her for oral sex. Tate was driving, Collins was in the front passenger seat, and E.C. was in the back seat. They discussed the prices while in the car. They drove to Collins's brother's house where he got into the back seat of the car and E.C. performed oral sex on him.[2] Collins then exited the vehicle, and Tate then got into the back seat. There was not enough room so Tate and E.C. went into the garage, and Collins went inside the house. Collins left the house approximately 10-15 minutes later when he received a text from Tate stating that "he ready." (Tr. 281.) They never spoke about what happened after or where E.C. went.

{¶ 10} Jody Remington ("Detective Remington") testified that she was a sex crimes detective with the Cleveland Police Department when she investigated E.C.'s case. Detective Remington interviewed E.C., who reported that the driver, later identified as Tate, of the vehicle she was a passenger in dragged her from the car to a completely dark garage. E.C. felt the cold barrel of a gun pressed to the back of her neck. Tate then proceeded to rob her and rape her vaginally and anally in the garage.

{¶ 11} Nurse Sarah Elliot ("Nurse Elliot"), testified that she performed the SANE exam on E.C. Reading from the medical report taken during E.C.'s sexual assault examination, Nurse Elliot testified as to how E.C. described the rape in the garage at gunpoint and how Tate threatened to kill her if she did not submit. E.C. recounted to Nurse Elliot as follows:

---

[2] Testimony at trial revealed that Collins's brother was not his biological brother, and references to Edgerson as his uncle brother's house or his uncle's house is consistent with the two people living there. (Tr. 422.)

> [W]hen I was in the garage, and he choked me, he told me he had a gun and I had to give him head. He made me lean up against the wall and did it vaginally, then he made me give him head again. He made me then [turn] back over and then he did it anally.
>
> Then he had me get on my hands and knees, and he did that until he finished. He told me to stay there and don't move, and he blocked me in the garage. Then I saw lights, and the car he was in left, so I found a piece of plywood on the window and pulled it off and went out the window.

(Tr. 375-376.)

{¶ 12} Cuyahoga County Cold Case Special Investigator Christy Kernik testified that on December 28, 2022, investigators executed a search warrant for buccal swabs based on a CODIS match of Tate's DNA profile to the DNA found on E.C.'s person. Ohio Bureau of Criminal Investigation Forensic Scientist Stacy Violi testified that Tate's DNA was found in the swabs taken from E.C.'s anal and perianal regions as well as in her underwear. Unknown male 1 was the contributor to DNA found in E.C.'s vaginal area, and Tate was not a major contributor. Additionally, the DNA swabs of E.C.'s leggings revealed a mixture of two contributors — E.C. and Unknown Male 1, with Tate as not a major contributor.

{¶ 13} Tate testified on his own behalf. He explained that on the day in question, he was driving with Collins when they observed a woman, later identified as E.C., standing on the street. They pulled over, Collins said something to E.C., and she entered the backseat of Tate's car. According to Tate, E.C. told them that her boyfriend "had her out there." (Tr. 452.) He claimed that Collins was discussing prices on the phone with E.C.'s boyfriend, not with E.C. as Collins testified. When they arrived at the house, E.C. and Tate entered the garage. According to Tate, as

soon as E.C. entered the garage, "she bent over, she instantly dropped her pants to her ankles and [he] honestly got turned on and I had sex with her." (Tr. 454.) Collins was watching them so Tate tried to hurry up. Tate testified that the garage doors were closed at this time. Tate further testified that he did not have a gun. Tate believed that he had consensual sex with E.C.

{¶ 14} Following the conclusion of trial, the jury found Tate guilty of all eight counts and each of the accompanying three-year firearm specifications. The jury found him not guilty of each of the one-year firearm specifications. The trial court sentenced him to three years in prison on the firearm specifications, which were to be served prior to and consecutive to the seven-year prison term on each of Counts 1-8, with five years of mandatory postrelease control. The court ordered that Counts 1-8 be served concurrently, except for the firearm specifications in Counts 1 and 2, which were ordered to be served consecutively for a total of 13 years in prison. The court classified Tate as a Tier III sexual offender. Additionally, the court ordered that Tate receive 338 days jail-time credit and waived costs and fees.

{¶ 15} It is from this order that Tate now appeals, raising four assignments of error for review, which shall be addressed out of order for ease of discussion.

## II. Law and Analysis

### A. Inconsistent Verdicts

{¶ 16} In the second assignment of error, Tate contends that the convictions for the three-year firearm specifications in each of the eight counts where he was found not guilty on the one-year firearm specification must be vacated as

inconsistent verdicts, with retrial barred on double jeopardy grounds. In doing so, Tate incorporates his argument from the first assignment of error, in which he also challenges his convictions on the three-year firearm specifications, citing to caselaw on inconsistent verdicts and multiplicity. Tate raises his challenge in the first assignment of error via ineffective assistance of counsel and alternatively, plain error. However, because Tate acknowledges that defense counsel "objected to the inconsistent finding at trial when the verdict was returned and even moved for an acquittal, or post-conviction relief pursuant to Crim. R. 29(C) and Crim. R. 35 prior to sentencing," we will begin by addressing his inconsistent verdict argument under the second assignment of error.

{¶ 17} The one-year firearm specification is set forth in R.C. 2941.141(A) and provides as follows:

> Imposition of a one-year mandatory prison term upon an offender under division (B)(1)(a)(iii) of section 2929.14 of the Revised Code is precluded unless the indictment, count in the indictment, or information charging the offense specifies that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense.

{¶ 18} Whereas, the three-year firearm specification is set forth in R.C. 2941.145(A) and provides:

> Imposition of a three-year mandatory prison term upon an offender under division (B)(1)(a)(ii) of section 2929.14 of the Revised Code is precluded unless the indictment, count in the indictment, or information charging the offense specifies that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense.

{¶ 19} Tate acknowledges that Ohio appellate courts have repeatedly held that "an acquittal on a one-year firearm specification and a finding of guilt on a three-year firearm specification do not result in an inconsistent verdict requiring the vacation of the three-year specification," but contends that we must follow the Ohio Supreme Court in *State v. Koss*, 49 Ohio St.3d 213 (1990), and vacate his convictions under R.C. 2941.145(A) because they are inconsistent with his acquittals under R.C. 2941.141(A). Tate's argument, however, is unpersuasive. As Tate acknowledges, in *State v. Hill*, 2013-Ohio-3245 (8th Dist.), this court has previously rejected his "inconsistent verdicts" argument and we decline, in the instant case, to change the course of this court's precedent.

{¶ 20} The appellant, in *Hill*, challenged the jury verdicts finding him guilty of the three-year firearm specifications and not guilty of the one-year firearm specification and argued that these verdicts were inconsistent and invalid. In overruling the appellant's argument, we stated:

> As a general principle, we note that the individual counts of an indictment containing more than one count are not interdependent, and an inconsistency in a verdict does not arise out of inconsistent responses to different counts but only arises out of inconsistent responses to the same count. *State v. Lovejoy*, 79 Ohio St.3d 440, 1997-Ohio-371, 683 N.E.2d 1112, paragraph one of the syllabus. Similarly, an acquittal on a one-year firearm specification and a finding of guilt on a three-year firearm specification do not result in an inconsistent verdict requiring the vacation of the three-year specification. *State v. Glenn*, 1st Dist. Hamilton No. C-090205, 2011-Ohio-829, ¶ 69, citing *State v. Hampton*, 1st Dist. Hamilton No. C-010159, 2002-Ohio-1907.

*Id.* at ¶ 26.

{¶ 21} More recently, in *State v. Maldonado*, 2021-Ohio-1724 (8th Dist.), and *State v. Amey,* 2018-Ohio-4207 (8th Dist.), we expressed our rejection of *Koss*.[3] In *Amey*, we explained:

> Amey relies on [*Koss*] in support of his inconsistent-verdicts argument. In that case, the Ohio Supreme Court held that an acquittal on a gun specification but the finding of guilt on the principal offense of voluntary manslaughter for causing the death of a victim with the firearm were inconsistent, and therefore, the voluntary manslaughter conviction was reversed. There was no legal authority or analysis in support of the conclusion reached in that case. *Koss*, in fact, contradicted the Ohio Supreme Court's earlier conclusion on inconsistency between the principal charge and the associated specification. *State v. Perryman*, 49 Ohio St.2d 14, 25-26, 358 N.E.2d 1040, paragraph 3 of the syllabus (1976) ("Where a jury convicts a defendant of an aggravated murder committed in the course of an aggravated robbery, and where that defendant is concurrently acquitted of a specification indicting him for identical behavior, the general verdict is not invalid.").
>
> Although some courts valued *Koss* based on recency, that support has faded. *State v. Given*, 7th Dist. Mahoning No. 15 MA 0108, 2016-Ohio-4746, ¶ 73-75, citing *Perryman* (noting the conflict created by *Koss* and deeming the decision in *Koss* to be of limited value); *see also State v. Lee*, 1st Dist. Hamilton No. C-160294, 2017-Ohio-7377, ¶ 43; *State v. Ayers*, 10th Dist. Franklin No. 13AP-18, 2013-Ohio-5601, ¶ 24. It may be time to consider *Koss* as nothing more than an outlier; however, any such conclusion would be outside the scope of this appeal.

*Id*. at ¶ 17-18.

{¶ 22} In *Maldonado*, the appellant argued that the acquittals on the one-year and three-year firearm specifications are inconsistent with both the conviction

---

[3] In *Amey*, the appellant relied on *Koss* and claimed that the trial court's acquittal of the felonious assault and felony murder counts was inconsistent with the finding of guilt on the voluntary manslaughter count. *Id*. at ¶ 7. While Amey's challenge regarded his voluntary manslaughter conviction and not firearm specifications, the analysis, nevertheless, is the same.

for discharging a firearm in violation of R.C. 2923.162 and the five-year "drive-by" firearm specifications. *Id.* at ¶ 45. We acknowledged our holding in *Amey* and that we have consistently "held that a not guilty verdict on firearm specifications does not present a fatal inconsistency with a guilty verdict for the principal charge." *Id.* at ¶ 48, citing *State v. Hollins*, 2020-Ohio-4290 (8th Dist.), citing *State v. Jackson*, 2018-Ohio-2131, ¶ 8 (8th Dist.); *State v. Williams*, 2011-Ohio-5483 (8th Dist.); *State v. Hardware*, 2010-Ohio-4346, ¶ 17, (8th Dist.), citing *State v. Fair*, 2008-Ohio-930 (8th Dist.); *State v. Robinson*, 2013-Ohio-4375 (8th Dist.). In *Maldonado*, we stated:

> As this court explained in *Fair*, "[i]t is entirely proper for the jury to find appellant guilty of aggravated robbery without a firearm specification." *Id.* at ¶ 26. *In Robinson*, this court further explained:
>
> > Robinson argues that based upon the Ohio Supreme Court's holding in *State v. Evans*, 113 Ohio St.3d 100, 2007-Ohio-861, 863 N.E.2d 113, [stating that completely dependent upon, the existence of the underlying criminal charge] a firearm specification is considered dependent on the underlying charge, and thus the two should be considered the same count. This court, however, has consistently rejected this argument. * * *.
> >
> > Here, the evidence supported the felony murder, felonious assault, and the discharge of a firearm on or near a prohibited place, the court instructed on the specifications independently and separately, and the convictions on these counts were not dependent upon a finding on the specifications. Accordingly, consistent with this court's precedent, we overrule the tenth assignment of error.
>
> *Robinson*, 2013-Ohio-4375, ¶ 102-103.
>
> Therefore, the acquittals on the specifications are not fatally inconsistent with the convictions for the principal offenses.

*Id.* at ¶ 48-49.

{¶ 23} Based on the foregoing, we continue to hold that "an acquittal on a one-year firearm specification and a finding of guilt on a three-year firearm specification do not result in an inconsistent verdict requiring the vacation of the three-year specification." *Hill*, 2013-Ohio-3245, at ¶ 26 (8th Dist.), citing *Glenn*, 2011-Ohio-829, at ¶ 69 (1st Dist.), citing *Hampton*, 2002-Ohio-1907 (1st Dist.). Indeed, "[i]t has long been settled that inconsistent verdicts between independent counts do not create a reversible error. '"Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment."'" *United States v. Powell*, 469 U.S. 57, 62, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984), quoting *Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932)." *State v. Jones*, 2019-Ohio-5237, ¶ 31 (8th Dist.). In *Jones*, we went on to state:

> "The several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count." *State v. Lovejoy*, 79 Ohio St. 3d 440, 1997-Ohio-371, 683 N.E.2d 1112 (1997), paragraph one of the syllabus. In other words, inconsistent responses to different counts do not create inconsistent verdicts. "An inconsistent verdict may very well be a result of leniency and compromise by the jurors, rather than being caused by [jury] confusion." *State v. Fraley*, 5th Dist. Perry No. 03 CA 12, 2004-Ohio-4898, ¶ 15, citing *Powell*. This court has also observed that "the validity of a conviction does not depend on consistency between verdicts on various counts of a multiple count indictment when a jury finds the defendant guilty of one or more offenses and not guilty on others even though the difference in the verdicts cannot rationally be reconciled." *City of Brecksville v. Malone*, 8th Dist. Cuyahoga Nos. 75466 and 75651, 2000 Ohio App. LEXIS 587 (Feb. 17, 2000), *appeal not allowed*, 89 Ohio St. 3d 1451, 731 N.E.2d 1139 (2000). *See also State v. Amey*, 2018-Ohio-4207, 120 N.E.3d 503, ¶ 16 (8th Dist.) (it must be remembered that inconsistent verdicts should not necessarily be interpreted as a windfall for the prosecution at the defendant's expense); *State v. Taylor*, 8th Dist. Cuyahoga

No. 89629, 2008-Ohio-1626 (inconsistent verdicts on different counts of a multi-count indictment do not justify overturning a verdict of guilt).

*Id.* at ¶ 31.

{¶ 24} Here, the jury acquitted Tate of the one-year firearm specifications but convicted him of the three-year firearm specifications. The jury could have rendered these seemingly inconsistent verdicts for any number of reasons. For the reasons set forth in more detail below, the State presented sufficient evidence that Tate had a firearm on or about his person or under his control while raping, robbing, and kidnapping E.C. Thus, "[t]he seemingly inconsistent verdicts were likely a product of compromise and leniency." *Id.* at ¶ 32. Indeed, "'[i]t would be incongruous for a defendant to accept the benefits of an inconsistent verdict without also being required to accept the burden of such verdicts.'" *Id.* at ¶ 33, quoting *Taylor* at ¶ 10, citing *Powell*.

{¶ 25} Therefore, the second assignment of error is overruled.

**B. Ineffective Assistance of Counsel, Multiplicity, and Plain Error**

{¶ 26} In the first assignment of error, Tate argues defense counsel was ineffective in failing to eliminate multiplicity from the indictment and failing to have the jury instructed on the one- and three-year firearm specifications as a single sentence enhancement finding in each count. Alternatively, Tate argues that if defense counsel is not found to be ineffective, we should review for plain error.

### 1. Standard of Review

{¶ 27} To establish ineffective assistance of counsel, Tate must demonstrate that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *State v. Trimble*, 2009-Ohio-2961, ¶ 98, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to prove either prong of this two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000), citing *Strickland* at 697. Furthermore, in Ohio, every properly licensed attorney is presumed to be competent, and a defendant claiming ineffective assistance of counsel bears the burden of proof. *State v. Davis*, 2021-Ohio-4015, ¶ 25 (8th Dist.), citing *State v. Black*, 2019-Ohio-4977, ¶ 35 (8th Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 100 (1985). When evaluating counsel's performance on an ineffective-assistance-of-counsel claim, the court "must indulge a strong presumption" that counsel's performance "falls within the wide range of reasonable professional assistance." *Strickland* at 689; *see State v. Powell*, 2019-Ohio-4345, ¶ 69 (8th Dist.), quoting *State v. Pawlak*, 2014-Ohio-2175, ¶ 69 (8th Dist.) ("'A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'").

### 2. Multiplicity

{¶ 28} In the instant case, Tate was found not guilty of the one-year firearm specification on each count, but guilty of the three-year firearm specification within the same count. Tate contends this inconsistent verdict within the same count

violates the double jeopardy clause and its subsidiary doctrine, multiplicity. Specifically, Tate contends that defense counsel prejudiced him by failing to seek dismissal of the indictment and failing to request jury instructions requiring the jury to make specific factual findings as to the firearm specifications.

{¶ 29} "An indictment is multiplicitous where it charges a single offense in multiple counts." *State v. Hendrix*, 2012-Ohio-2832, ¶ 51 (11th Dist.), citing *State v. Ross*, 2012-Ohio-536, ¶ 69 (9th Dist.); *see also State v. Johnson*, 2009-Ohio-6800, ¶ 19 (1st Dist.) ("Multiplicity occurs when a single crime has been arbitrarily divided or separated into two or more separate counts."). "'[T]he vice of a multiplicitous indictment lies in the possibility of multiple punishments for a single offense in violation of the cumulative punishment branch of the Double Jeopardy Clause of the Fifth Amendment.'" *Id.*, quoting *State v. Childs*, 88 Ohio St.3d 558, 561 (2000). That is, it "may give rise to a double-jeopardy violation by resulting in multiple sentences for a single offense, or that it may prejudice a defendant by causing a guilty verdict on a given count solely on the strength of evidence on the remaining counts." *Johnson* at ¶ 19, citing *United States v. Gibbons*, 994 F.2d 299, 301 (6th Cir. 1993); *United States v. Gullett*, 713 F.2d 1203, 1211-1212 (6th Cir. 1983). "In Ohio, the primary legislative statement on the multiplicity issue is found in R.C. 2941.25, concerning allied offenses of similar import." *Childs* at 561; *see also Ross* at ¶ 69, citing *Johnson* at ¶ 20; *State v. Dudas*, 2009-Ohio-1001, ¶ 45 (11th Dist.); *State v. Blalock*, 2002-Ohio-4580, ¶ 75-76 (8th Dist.); *State v. Banks*, 1993 Ohio App. LEXIS 2827, *8 (10th Dist. June 3, 1993).

{¶ 30} We note that the Ohio Supreme Court has recognized and Tate acknowledges that firearm specifications are merely sentence enhancements, not separate criminal offenses. *State v. Ford*, 2011-Ohio-765, paragraph one of the syllabus ("[A] firearm specification is a penalty enhancement, not a criminal offense."); *State v. Gray*, 2022-Ohio-2940, ¶ 16 (4th Dist.) Thus, "courts cannot apply the allied-offense analysis to specifications because the sentence imposed for a specification is a sentencing enhancement." *State v. Ladson*, 2017-Ohio-7715, ¶ 35 (8th Dist.), citing *State v. Dean,* 2015-Ohio-4347, ¶ 219 (R.C. 2941.25 and the attendant allied-offense analysis do not apply to sentencing enhancements such as firearm specifications). Because sentence enhancements are not criminal offenses, it follows that the inclusion of multiple sentence enhancements in an indictment does not render the indictment multiplicitous or violate double jeopardy principles.

{¶ 31} Given that the inclusion of one- and three- year firearm specifications in the indictment do not render it multiplicitous or violate double jeopardy principles, defense counsel was not ineffective for failing to seek dismissal of the indictment on multiplicity grounds. Moreover, Tate's argument that the multiple firearm specifications prejudiced the jury against him is nothing more than speculation. The State presented testimony from E.C., first responders, and other eyewitnesses, as well as DNA evidence confirming the presence of Tate's semen. There is no basis to believe that a conviction would have been less likely had he faced fewer firearm specifications. For these reasons, we find Tate's ineffective assistance argument as to multiplicity in the indictment unpersuasive.

{¶ 32} Turning to the second incidence of ineffective assistance of counsel alleged, Tate argues that defense counsel should have requested a special verdict and/or jury interrogatories. Tate contends that the three-year firearm enhancement implicitly includes the one-year enhancement and should be submitted to the jury to reach a specific finding of fact on each of the elements. He proposes that the jury would first consider whether the defendant had a firearm on or about his person or under his control while committing the offense. If the finding is not guilty, then both enhancements are defeated and the jury goes no farther. If the finding is guilty, then the jury has met the one-year firearm specification and then considers if the defendant displayed or used it during the offense. If that finding is not guilty, then the offender remains subject to merely the one-year enhancement, and if it is guilty, then the firearm enhancement is increased to three-years.

{¶ 33} Tate proposes a system where a defendant's guilt as to both the one- and three-year firearm specifications would be determined through two specific factual findings. Special verdicts and jury interrogatories, however, have been disfavored in criminal law and their use in this setting is questionable. *Westlake v. Y.O.*, 2019-Ohio-2432, ¶ 43, 46 (8th Dist.) (noting that "the use of jury interrogatories in criminal cases is questionable" and a "review of the law does not reveal any instance when the use of jury interrogatories in criminal cases was determined to be appropriate"). With regard to special verdicts, the Ohio Supreme Court has held that "[s]pecial verdicts by juries are required only where specifically mandated by statute." *State v. Cook*, 65 Ohio St.3d 516, 525 (1992), citing *State v.*

*Jenkins*, 15 Ohio St.3d 164 (1984); *see also State v. Walton*, 1983 Ohio App. LEXIS 16006, *18 (8th Dist. June 9, 1983) ("[T]he verdict form cannot be used to explore the jury's reasons for its general verdict."). "The verdict forms in criminal cases reflect a jury's decision on counts in the indictment or complaint — guilt or innocence; and whether those offenses are lessened or enhanced for sentencing purposes — the finding of aggravating or mitigating circumstances, specifications, or notifications." *Y.O.* at ¶ 43. While Tate argues for a special verdict, he does not cite to any statute mandating special verdicts in the instant case.

{¶ 34} Given that Tate's proposed jury interrogatories are inappropriate, we decline to find that defense counsel was ineffective for not requesting this type of interrogatory. Moreover, Tate cannot demonstrate that he was deprived of a fair trial because of defense counsel's failure to "seek that the jury be instructed on the firearm specifications as a single specification with separate findings as to each specific element." Thus, we cannot say defense counsel was ineffective.

### 3. Plain Error

{¶ 35} Alternatively, Tate argues if we decline to find ineffective assistance of counsel, we should review for plain error. Tate essentially reasserts his ineffective assistance argument regarding the jury instructions by contending that the trial court committed plain error when it instructed the jury on both firearm specifications in each count as separate specifications.

{¶ 36} Plain error is an obvious error or defect in the trial court proceedings that affects a defendant's substantial right and the outcome of the trial.

Crim.R. 52(B); *State v. Rogers*, 2015-Ohio-2459, ¶ 22.  The Ohio Supreme Court, however, has admonished appellate courts to "notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 37} For the reasons stated above, we decline to find plain error.  The trial court properly instructed the jury on all counts in the indictment and separately instructed the jury on both firearms specifications attached to each count.  Moreover, Tate cannot demonstrate that the outcome of the trial clearly would have been affected if the instruction he contends had been given.  And for reasons set forth in more detail below, there is sufficient evidence to sustain his conviction.

{¶ 38} Accordingly, the first assignment of error is overruled.

## C. Sufficiency and Manifest Weight of the Evidence

{¶ 39} We note that Tate's sufficiency and manifest weight assignments of error are interrelated, in that Tate relies on his sufficiency argument in his manifest weight challenge, so we address them together.  Tate contends, in the third assignment of error, that there is insufficient evidence to sustain his convictions.  In the fourth assignment of error, Tate contends that his convictions are against the manifest weight of the evidence for the same reasons set forth in his sufficiency argument.  We find both of Tate's contentions unpersuasive.

{¶ 40} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial.  *State v. Bowden*, 2009-Ohio-

3598, ¶ 12 (8th Dist.).  An appellate court's function when reviewing sufficiency is to determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 41} With a sufficiency inquiry, an appellate court does not review whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction.  *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).  A sufficiency of the evidence argument is not a factual determination, but a question of law.  *Thompkins* at 386.

{¶ 42} In *State v. Jones*, 2021-Ohio-3311, the Ohio Supreme Court cautioned:

> But it is worth remembering what is not part of the court's role when conducting a sufficiency review.  It falls to the trier of fact to "'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" [*State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 24], quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  Thus, an appellate court's role is limited.  It does not ask whether the evidence should be believed or assess the evidence's "credibility or effect in inducing belief." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541.  Instead, it asks whether the evidence against a defendant, if believed, supports the conviction. *Thompkins* at 390 (Cook, J., concurring).

*Id.* at ¶ 16.

{¶ 43} Comparatively, "a manifest weight challenge questions whether the prosecution has met its burden of persuasion." *Bowden*, 2009-Ohio-3598, at ¶ 13, citing *Thompkins* at 390. When reviewing a manifest weight challenge, an appellate court, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 2022-Ohio-1397, ¶ 54, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶ 44} As this court has previously stated:

> The criminal manifest weight of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997). Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id.* Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054 (2000).
>
> When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id.*, quoting *Thompkins* at *id.*

*State v. Williams*, 2020-Ohio-269, ¶ 86-87 (8th Dist.).

{¶ 45} Here, Tate was convicted of two counts of kidnapping, two counts of aggravated robbery, and four counts of rape, along with the accompanying three-year firearm specification on each count. In challenging his convictions, Tate argues that there was insufficient evidence to prove that he possessed a firearm; his firearm was operable; he inflicted serious physical harm on E.C.; E.C. did not consent to sexual conduct; he used force or the threat thereof in raping E.C.; he raped and robbed E.C.; and he used force or deception in kidnapping E.C.

### 1. Three-Year Firearm Specification

{¶ 46} Tate was convicted of the three-year firearm specification on all counts in violation of R.C. 2941.145(A), which requires that "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

{¶ 47} Initially, we note that Tate begins his challenge to the three-year firearm specification convictions by reiterating the arguments from his first two assignments of error. He contends that a not guilty finding on the one-year firearm specification necessitates a not guilty finding on the three-year firearm specification. We note that "'[a]s long as sufficient evidence supports the jury's verdict at issue, other seemingly inconsistent verdicts do not undermine the otherwise sufficient evidence.'" *Maldonado*, 2021-Ohio-1724, at ¶ 50, quoting *State v. Crabtree*, 2010-Ohio-3843, ¶ 19, citing *State v. Trewartha*, 2005-Ohio-5697.

{¶ 48} Tate then argues that the three-year firearm specification convictions must be vacated because there was insufficient evidence that he actually had a firearm on his person or about his control and there was no evidence to support its operability. In support of his argument, he cites to E.C.'s testimony that she believed Tate had a firearm because he told her he did, but she never observed the gun. And since E.C. never actually observed the firearm, there was no way to know that the item was even a firearm and there could be no finding as to its operability. We disagree.

{¶ 49} A review of the record reveals that the State presented sufficient evidence to establish that Tate possessed a firearm. E.C. testified that after she entered the garage, she felt something pressed against her head and then Tate told her to remove her pants. E.C. believed it was a gun and described it as "cold and hard" and "weighted." (Tr. 208.) E.C. testified that she is familiar with what guns feel like because a couple of weeks prior to the incident, she was "pistol whipped." (Tr. 209.) Furthermore, E.C. reported to Detective Remington and Nurse Elliot that she had the cold barrel of a gun pressed to the back of her neck and Tate told her multiple times that he had a gun and threatened to kill E.C. This evidence sufficiently established that Tate possessed a gun when he raped, kidnapped, and robbed E.C.

{¶ 50} Tate also challenges the sufficiency of the State's evidence as to the operability of the firearm. The term "firearm" is defined in R.C. 2923.11(B)(1) as "any deadly weapon capable of expelling or propelling one or more projectiles by the

action of an explosive or combustible propellant. 'Firearm' includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable." Furthermore, "[w]hen determining whether a firearm is capable of expelling . . . one or more projectiles by the action of an explosive . . . propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm." R.C. 2923.11(B)(2).

{¶ 51} Tate, distinguishing *State v. Watkins*, 2004-Ohio-6908 (8th Dist.), and relying on *State v. Roscoe*, 2013-Ohio-3617 (8th Dist.), argues that his three-year firearm specification convictions should be vacated because E.C.'s testimony, without additional evidence, does not support a finding that the gun was operable at the time of the offense. In *Watkins*, the victim was standing at a bus stop when the defendant pressed what the victim said felt like a gun to his side and stated, "[Y]ou know what it is," before robbing him. *Id*. at ¶ 4. On appeal, the defendant argued the State failed to prove the use of a firearm in the commission of the crime because no one observed the gun.

{¶ 52} In affirming the defendant's conviction, we noted that the State could prove a firearm specification by the testimony of lay witnesses who were in a position to observe the instrument and the circumstances surrounding the crime and by circumstantial evidence. *Id*. at ¶ 14-15, citing *State v. Murphy*, 49 Ohio St.3d 206 (1990); *Thompkins*, 78 Ohio St.3d 380. In *Thompkins*, the Ohio Supreme Court stated:

A firearm enhancement specification can be proven beyond a reasonable doubt by circumstantial evidence. In determining whether an individual was in possession of a firearm and whether the firearm was operable or capable of being readily rendered operable at the time of the offense, the trier of fact may consider all relevant facts and circumstances surrounding the crime, *which include any implicit threat made by the individual in control of the firearm.* (*State v. Murphy* [1990], 49 Ohio St.3d 206, 551 N.E.2d 932, *State v. Jenks* [1991], 61 Ohio St. 3d 259, 574 N.E.2d 492, and *State v. Dixon* [1995], 71 Ohio St. 3d 608, 646 N.E.2d 453, followed; R.C. 2923.11[B][1] and [2], construed and applied.)

(Emphasis added.) *Id.* at paragraph one of the syllabus.

{¶ 53} While the victim in *Watkins* did not observe the gun and was "not 100 percent sure there was a gun involved," we reasoned that the defendant's actions and statements coupled with the victim's acquiescence were sufficient circumstantial evidence that a firearm was operable during the robbery. *Id.* at ¶ 21-23.

{¶ 54} In *Roscoe*, the victim was on a quest to find drugs and eventually ended up following the defendant and two other men to a house in Cleveland's east side where one of the men told her to give him her money and jewelry. The defendant pressed something small, cold, and hard against her neck from behind. The victim assumed it to be a gun and did not resist as the other man robbed her. While that man walked away, the defendant pulled her toward the backyard of the house, still pressing the object to her neck, where she was then raped vaginally, anally, and orally. *Id.*, 2013-Ohio-3617, ¶ 3 (8th Dist.).

{¶ 55} On appeal, the defendant argued there was insufficient evidence to sustain the firearm specification convictions. We agreed, finding that the State did

not satisfy its burden that a gun was in existence or operable at the time of the offense. *Id*. at ¶ 37. In finding so, we stated:

> In this case, we have the testimony of the victim that [the defendant] placed a small, cold, hard object to her neck. Although the victim testified that she believed the object was a gun, the state provided no other evidence, as required, that this object was, in fact, a gun. [The defendant] never threatened to shoot the victim and the victim never identified the object pressed against her neck as a gun. The victim's description of the object as small, cold and hard could be used to describe countless objects. It is this court's conclusion that this belief, without more, does not create sufficient circumstantial evidence to support [the defendant's] conviction.

*Id*.at ¶ 36

{¶ 56} Additionally, in *Roscoe*, we distinguished *Watkins*, emphasizing that, unlike in *Watkins*, the victim in *Roscoe* did not hear statements from the defendant suggesting he had a firearm. *Roscoe* at ¶ 34-36.

{¶ 57} In the instant case, however, the State presented testimony that Tate threatened E.C. with a firearm during the commission of the offenses. Therefore, Tate's reliance on *Roscoe* is unpersuasive and the facts of this case are more akin to *Watkins*. Indeed, E.C. testified that Tate pressed something "cold, hard and weighted" against the back of her head and she immediately believed the object as a gun, because she was familiar with guns and had, only weeks earlier, felt a gun pressed to her head. E.C. acquiesced to Tate's demands because he "was getting more and more frustrated" and she was afraid of what he would do if she did not comply. (Tr. 212.) According to Nurse Elliot, Tate told E.C. that "he had a gun, and he was going to kill [E.C.] and [her] fiancé." (Tr. 373.) This testimony establishes

that Tate stated that he had a gun and would use it if E.C. did not comply and is sufficient to establish that Tate's firearm was operable and is sufficient to support the firearm convictions.

### 2. Aggravated Robbery

{¶ 58} Tate next argues that there was insufficient evidence to sustain his convictions under R.C. 2911.01(A)(1) and (3), which provides:

No person, in attempting or committing a theft offense . . . or in fleeing immediately after the attempt or offense, shall . . .

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

. . .

(3) Inflict, or attempt to inflict, serious physical harm on another.

{¶ 59} In challenging his aggravated robbery convictions, Tate again relies on his acquittal on the one-year firearm specifications as proof of the insufficiency of the State's evidence regarding his possession of a gun. With regard to this argument, we again note that "'[a]s long as sufficient evidence supports the jury's verdict at issue, other seemingly inconsistent verdicts do not undermine the otherwise sufficient evidence.'" *Maldonado*, 2021-Ohio-1724, at ¶ 50, quoting *Crabtree*, 2010-Ohio-3843, at ¶ 19 (10th Dist.), citing *Trewartha*, 2005-Ohio-5697 (10th Dist.).

{¶ 60} Tate then argues that his aggravated robbery conviction under R.C. 2911.01(A)(1) should be vacated because the evidence does not support a finding that he possessed a firearm and that it was operable. Having found that the

State presented sufficient evidence to establish that Tate possessed a firearm and that it was operable, his challenge to his aggravated robbery conviction on this ground is unpersuasive.

{¶ 61} With regard to his conviction under R.C. 2911.01(A)(3), Tate argues that there was insufficient evidence to sustain this conviction because E.C. could not identify him and he did not rape E.C. Tate is incorrect. The State presented evidence that, if believed, was more than sufficient to establish beyond a reasonable doubt Tate's identity as the individual who robbed, raped, and kidnapped E.C. Tate's DNA was present in the swabs taken from E.C.'s anal and perianal regions as well as in her underwear. Moreover, E.C. testified that she recognized Tate as her assailant at trial through his physical presence (i.e. his height, his hair, and his glasses). (Tr. 234.) E.C. further testified that she recognized Tate when she ran into him at a bar sometime after the rape. E.C. stated that she "stopped drinking for, like, two or three years because [Tate] was out in my area drinking, and I didn't feel like I could do anything." (Tr. 239.) Cumulatively, this evidence was sufficient to establish Tate's identity as the individual who robbed, raped, and kidnapped E.C.

{¶ 62} With regard to Tate's serious-physical-harm argument, he contends that their sexual encounter was consensual, and therefore, he did not inflict or attempt to inflict serious physical harm as required by R.C. 2911.01(A)(3). We note, however, when an offender commits rape and robbery contemporaneously, in a way that intertwines the crimes so that one does not neatly end before the other begins, the rape can satisfy the "serious physical harm" element of aggravated robbery.

*State v. Malone*, 15 Ohio App.3d 123, 125 (9th Dist. 1984). Similarly, Tate acknowledges that we have previously held that

> the commission of rape is sufficient evidence from which a reasonable inference could be drawn that there was an attempt to cause serious physical harm. *See, State v. Malone* (1984), 15 Ohio App. 3d 123. (where defendant forcibly carried victim to secluded area, takes her money and rapes her, the rape could be considered by the jury in determining whether there was an attempt to cause or actual serious physical harm). A criminal attempt occurs when a person takes a substantial step toward the commission of a crime. *State v. Woods* (1976), 48 Ohio St. 2d 127. Therefore, the rape immediately following the theft is sufficient evidence of an attempt to cause serious physical harm[.]

*State v. Calhoun*, 1991 Ohio App. LEXIS 5654, *7-8 (8th Dist. Nov. 27, 1991).

{¶ 63} Contrary to Tate's assertion and as explained in more detail below, the State presented sufficient evidence that Tate raped E.C. and that the rape occurred immediately after he took E.C.'s cell phone, money, and box cutter. The rape immediately following the theft is sufficient evidence of an attempt to cause serious physical harm. Thus, when viewing this evidence in a light most favorable to the State, we find sufficient evidence to uphold Tate's aggravated robbery convictions.

### 3. Rape

{¶ 64} In challenging the sufficiency of the evidence of his rape convictions under R.C. 2907.02(A)(2), Tate contends that E.C. consented to engage in sexual conduct as part of a sex-for-pay arrangement and there was no evidence of rape by force for vaginal or anal intercourse. R.C. 2907.02(A)(2) provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels

the other person to submit by force or threat of force." R.C. 2901.01(1) defines "force" as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing."

{¶ 65} Ohio's rape statute, however, does not require proof of the victim's lack of consent. *State v. Jackson*, 2023-Ohio-455, ¶ 21 (8th Dist.), citing R.C. 2907.02(A)(2); *State v. Hartman*, 2016-Ohio-2883, ¶ 27 (2d Dist.).[4] Additionally, proof of physical resistance is not required to prove rape under Ohio law. *Id.*, citing R.C. 2907.02(C) ("A victim need not prove physical resistance to the offender in prosecutions under this section."). Rather, when consent is used as a defense to challenge the State's evidence on the element of purposeful force or compulsion, "there must be some evidence of lack of consent or resistance to show that the defendant 'purposely compel[led]' the other person to submit." *State v. El-Berri*, 2008-Ohio-3539, ¶ 57 (8th Dist.) (Stewart, J., dissenting), citing R.C. 2907.02(A) (2); *see also Jackson* at ¶ 21; *Hartman* at ¶ 27.

{¶ 66} Even though E.C. admitted that she initially consented to oral sex with Tate in the garage, once Tate used the gun and threatened E.C., she did not consent, and Tate continuing to have sexual intercourse with her amounts to forcible rape. In *Hartman*, the Second District explained:

> We agree that the elements of [r]ape can be established when the two participants start the sexual encounter on a consensual basis, but the consent is revoked by words, actions or conduct that clearly communicates non-consent, the defendant fails to respect the change

[4] "Ohio law does recognize certain victims incapable of giving consent, based on mental or physical incapacity. Those exceptions do not apply in the case before us." *Hartman* at ¶ 27 (2d Dist.), citing *State v. Hillock*, 2002-Ohio-6897 (7th Dist.).

in consent, and purposely proceeds to engage in sexual conduct through force or threat of force evidenced by violence, physical restraint, or some type of coercive or threatening conduct that creates a belief or fear that physical force will be used if the victim does not consent.

*Id.* at ¶ 32. *See State v. Tegarty*, 2023-Ohio-1369, ¶ 49 (8th Dist.), citing *Hartman* and *In re E.S.*, 2022-Ohio-2003 (5th Dist.) (when the sexual activity was no longer consensual and became a forcible act, appellant committed rape).

{¶ 67} In the matter before us, E.C.'s testimony confirms that she never consented to vaginal and anal sex with Tate, despite initially consenting to oral sex with Tate. E.C. testified that after she finished performing oral sex on Collins, she decided that she "was going to mess around with [Tate], just not inside of the car" and E.C. went with Tate into the garage with the sole intention of performing oral sex on him. (Tr. 206-207.) E.C. explained that when she entered the dark garage with Tate, "the whole feeling in the room changed." (Tr. 207.) Tate then stood behind her and she felt a cold, hard object that she believed to be a gun pressed against her head as Tate directed her to pull her pants down. Regarding consent, E.C. testified:

> [E.C.]: I didn't care about the oral sex. I was in my 20s. That wasn't really a crazy idea. I wasn't a virgin at the time, obviously, so sex was what it was. I didn't agree being in a garage that was dark with a gun, and a man that was towering over me.
>
> [STATE]: And again, the vaginal and anal sex, did you consent to that?
>
> [E.C.]: No.
>
> [STATE]: What about the oral as it happened, what thought was going on in the back of your head, did you consent to that?

[E.C.]: I consented to all of it in a way that I wasn't going to fight a man who was much taller than me and armed with a gun. But, no, I didn't consent to, like, have sex with him or have anal sex. I would never consent to anal sex with anybody.

. . .

[STATE]: Now we had a conversation about all of this stuff that happened in the garage, and you used the word "I consented because," are we talking more about consent, or are we talking about submission?

[E.C.]: Submission. I was scared of what would happen if I didn't agree to it. He was getting more and more frustrated by me not being engaged in the activities, so that's kind of when it became more of a — whatever you want, that's what we're going to do — so I could get out of this garage situation.

(Tr. 210, 212.)

{¶ 68} This testimony establishes that E.C. never consented to vaginal or anal sex with Tate, nor did she ever consent to oral sex at gunpoint. Further, E.C.'s evident disengagement, Tate's anger in reaction, and his persistence thereafter in sexual activity at gunpoint are clear evidence of sexual conduct through force or threat of force.

{¶ 69} The State's evidence further corroborates E.C.'s testimony. Michael, who encountered E.C. immediately after her attack, testified that E.C. was screaming that someone was chasing her and that she was crying and shaking. Officer Quintana, the first responding officer, testified that E.C. was curled up in a ball crying and E.C. told him she "had been raped." (Tr. 259.) Detective Remington recounted how during their interview, E.C. described being vaginally and anally raped from behind while the cold barrel of a gun was pressed against her neck. Nurse Elliot testified to E.C.'s description of how she was raped in the garage at

gunpoint and how Tate threatened to kill her if she did not submit. Finally, DNA evidence revealed that Tate's DNA was present in E.C.'s anal cavity and underwear. Cumulatively, this evidence established that what began as a consensual encounter limited to oral sex turned to rape when Tate pressed a firearm against E.C.'s head and threatened to kill her if she did not comply. The fact that E.C. initially consented to the encounter or that she was supposedly paid for her services has no bearing on the fact that Tate compelled her to engage in sexual conduct through force or threat of force.

{¶ 70} Thus, we find that this evidence, when viewed in the light most favorable to the State, is sufficient to establish that E.C.'s resistance was overcome by a threat of force and that Tate raped E.C. Subsequently, the State has met its burden as to the element of force and Tate's rape convictions are supported by sufficient evidence.

### 4. Kidnapping

{¶ 71} Lastly, Tate argues the evidence was insufficient to establish kidnapping under R.C. 2905.01(A)(2) and (4). He contends that he did not use force or deception in engaging in sexual activity with E.C. in the garage because she willingly went into the garage as part of a paid-for prostitution arrangement and he was not shown to actually have a gun.

{¶ 72} R.C. 2905.01(A)(2) and (4) provide:

(A) No person, by force, threat, or deception, or . . . by any means, shall remove another from the place where the other person is found or

restrain the liberty of the other person, for any of the following purposes:

(2) To facilitate the commission of any felony or flight thereafter;

. . .

(4) To engage in sexual activity, as defined in [R.C. 2907.01], with the victim against the victim's will[.]

R.C. 2907.01(C) defines "sexual activity" as "sexual conduct or sexual contact, or both."

{¶ 73} For purposes of kidnapping under R.C. 2905.01, this court has interpreted the phrase "restrain the liberty" as encompassing actions "'to limit one's freedom of movement in any fashion for any period of time.'" *State v. Woodson*, 2011-Ohio-2796, ¶ 13 (8th Dist.), quoting *State v. Wingfield*, 1996 Ohio App. LEXIS 867 (8th Dist. Mar. 7, 1996); citing *State v. Walker*, 1998 Ohio App. LEXIS 4067 (9th Dist. Sept. 2, 1998) (restraint of liberty does not require prolonged detainment); *State v. Messineo*, 1993 Ohio App. LEXIS 38 (4th Dist. Jan. 6, 1993) (grabbing victim's arm and shaking her constituted restraint). Furthermore, the "'restraint "need not be actual confinement, but may be merely compelling the victim to stay where he is."'" *State v. Mosley*, 2008-Ohio-5483, ¶ 20 (8th Dist.), quoting *State v. Wilson*, 2000 Ohio App. LEXIS 5057 (10th Dist. Nov. 2, 2000), quoting 1974 Committee Comment to R.C. 2905.01.

{¶ 74} Here, Tate raped and robbed E.C. by force, and following the attack, he threatened E.C. at gunpoint to remain in the garage before leaving. The evidence at trial revealed that E.C. initially went into the garage only intending to perform

oral sex on Tate. As has been repeatedly explained, upon entering the garage, "the whole feeling in the room changed" and Tate pressed a gun to the back of E.C.'s head, threatening to kill her. (Tr. 207.) He then raped and robbed E.C. at gunpoint. E.C. testified about feeling trapped inside the garage after Tate left. She stated, "I was trying to figure out what would happen if I stayed in the garage? What would happen if I got out of the garage? How was I going to get out of the garage? Is he going to be close by if I got out of the garage? Where am I going to go? I don't know." (Tr. 211-212.) E.C. further testified that she did not intend to consent to vaginal or anal sex with Tate, nor did she consent to perform oral sex at gunpoint.

{¶ 75} Thus, E.C.'s testimony, when viewed in the light most favorable to the State, is sufficient to prove that Tate used force to restrain E.C.'s liberty for the purpose of engaging in sexual activity against her will and used force and the threat thereof in detaining E.C. Accordingly, there is sufficient evidence to sustain Tate's convictions for kidnapping under R.C. 2905.01(A)(2) and (4).

{¶ 76} Therefore, based on the foregoing, Tate's third assignment of error is not well-taken and overruled.

{¶ 77} The manifest weight of the evidence also supports Tate's convictions. Tate argues his convictions are against the manifest weight of the evidence for the reasons he stated in his sufficiency assignment of error. He attacks E.C.'s credibility and contends the jury lost its way. We note, however, that "'a conviction is not against the manifest weight of the evidence simply because the jury rejected the defendant's version of the facts and believed the testimony presented by the state.'"

*State v. Jallah*, 2015-Ohio-1950, ¶ 71 (8th Dist.), quoting *State v. Hall*, 2014-Ohio-2959, ¶ 2 (4th Dist.).

{¶ 78} Here, the jury found that Tate threatened E.C. with a gun and then proceeded to rape, rob, and kidnap her. In making that determination, the jury, as the trier of fact, was entirely free to believe E.C. and disbelieve Tate. Furthermore, much of E.C.'s testimony regarding the incident was corroborated by eyewitness testimony and physical evidence, while Tate's version of events was contradicted or unsubstantiated. Michael's testimony corroborates E.C.'s statements about escaping out of the garage through the loose board and running to the nearby senior living facility. Testimony from Officer Quintana detailed E.C.'s traumatized state immediately after being raped. Nurse Elliot's testimony is consistent with E.C.'s statements to law enforcement about Tate's threats with a gun. The presence of Tate's DNA in E.C.'s anal region corroborates E.C.'s account of being anally raped. And, Collins's testimony about leaving 10-15 minutes after they initially arrived at his uncle's residence does not align with Tate's version that he waited for 30-45 minutes in the car while Collins and E.C. were in the garage together. According to both Collins and E.C., they were never in the garage together and only had consensual oral sex when they pulled into Collins's uncle's driveway.

{¶ 79} The record is clear that this is not an exceptional case where the evidence weighs heavily against the conviction. Tate's convictions are supported by the manifest weight of the evidence. Tate's convictions are not against the manifest weight of the evidence merely because the jury chose to believe the State's version

of the facts and rejected Tate's. Thus, when all the evidence is weighed, we cannot say the jury clearly lost its way and created such a manifest miscarriage of justice that Tate's convictions must be reversed and a new trial ordered.

{¶ 80} Therefore, the fourth assignment of error is overruled.

{¶ 81} Accordingly, judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The appellant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MARY J. BOYLE, JUDGE

LISA B. FORBES, P.J., and
EMANUELLA D. GROVES, J., CONCUR